*In re* MARRIAGE OF MARLYN HYDE AGOSTINELLI, Petitioner-Appellee, and PETER L. AGOSTINELLI, Respondent-Appellant.

First District (1st Division)   Nos. 1—91—3500, 1—92—1573 cons.

Opinion filed July 26, 1993.

Schiller, Du Canto & Fleck, of Chicago (Sarane C. Siewerth and R. Christopher Ditton, of counsel), for appellant.

Rosenfeld, Rotenberg, Hafron & Shapiro, of Chicago (Kathryn D. Farmer and Howard H. Rosenfeld, of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:
Respondent, Peter Agostinelli (Peter), appeals from a judgment of dissolution of his marriage to petitioner, Marlyn Hyde Agostinelli (Marlyn). On appeal, Peter contends that the trial court erred in: (1) determining that two custodial savings accounts set up on behalf of the couple's then minor children created an irrevocable gift under the Illinois Uniform Gifts to Minors Act (UGMA) (Ill. Rev. Stat. 1979, ch. 110½, par. 201 *et seq.*); and (2) denying his request that Marlyn pay his attorney fees. For the following reasons, we affirm.

THE DISSOLUTION PROCEEDINGS
The record sets forth the following relevant facts. Peter and Marlyn were married on March 30, 1962. At the time of the dissolution proceeding, Peter was 58 and Marlyn was 51. Two children were born of the marriage, Janet and Paul, ages 27 and 17, respectively. The parties began experiencing serious marital difficulties in 1986.

Marlyn filed a petition for dissolution on August 27, 1987, and on August 1, 1988, Marlyn moved out of the marital residence.

The record discloses that at the time of trial on August 7, 1990, Marlyn was employed as an office manager at Organizational Dynamics Inc. (ODI), with an annual income of approximately $25,000. Prior to this employment, Marlyn had been a homemaker. Until his resignation in 1986, Peter was employed by G.D. Searle & Co. (Searle) as a corporate planner at an annual salary of $60,000. At the time of trial, Peter was working as a temporary accountant earning an annual income of approximately $17,000.

The parties stipulated that Peter had the following assets: an account through the Calvert Group with a balance of $71,659.20; an Individual Retirement Account (IRA) totalling $20,913.48; a pension fund through Searle in the amount of $20,520.07; a capital accumulation account valued at $18,560.23; and a Veteran's Administration insurance policy with a cash value of $11,386. The parties further stipulated that Marlyn had an IRA account valued at $2,171.56, and that they would split the proceeds from the sale of the marital residence pursuant to court order. In addition, Janet's and Paul's tax returns were admitted into evidence.

Marlyn testified that when Paul was young, Peter suggested that they start savings accounts for the children. Marlyn initially objected to putting all of their savings into accounts for the children, but Peter reassured her, telling her not to worry, that he was making a good salary. At that time, Peter's annual salary was $40,000 or $50,000, and the parties had additional savings in an IRA account, the Searle capital fund and the Searle pension fund. Peter told Marlyn that the purpose of the accounts was to save for the children's college education and provide funds for their "getting started in life."

The record shows that in 1980, Peter established two custodial savings accounts, one each for Janet and Paul, under the UGMA. Peter named himself as custodian of the accounts with sole signatory power and deposited approximately $28,000 in each account.

Marlyn and Peter had discussions with both Janet and Paul, individually, to inform them about the existence of the accounts. Peter told Janet that funds were put aside in her name for college, and Peter told Paul that he had put some money in savings for Paul for when he grew up.

In late May 1986 Paul was hospitalized. In June 1986 Peter resigned from his position at Searle. Peter testified that he resigned because he was disorganized and extremely depressed. Peter stated that he remained in bed for three months following his resignation,

after which time he sought medical treatment in the form of private and group therapy. At the time of trial, Peter sought therapy weekly. Peter offered no expert testimony regarding his mental condition.

Upon his resignation from Searle, Peter elected to terminate his family medical insurance. During 1986, Peter withdrew approximately $25,000 to $30,000 from Paul's UGMA account to pay Paul's hospitalization and medical expenses. On another occasion, Peter withdrew $9,000 from Janet's account to buy a car and to pay household expenses. Marlyn testified that she was unaware of these withdrawals, having first learned that Peter had withdrawn money from the UGMA accounts at Peter's deposition. The record shows that deposits were made into the two UGMA accounts between June 9, 1980, and December 1, 1982, and that all withdrawals were made from the UGMA accounts between January 24, 1986, and April 18, 1988. In addition, the record shows that Peter prepared tax returns on behalf of both Janet and Paul, claiming UGMA account interest.

Peter disputed Marlyn's testimony regarding the establishment of the UGMA accounts. Peter stated that he established the savings accounts in the children's names for "tax avoidance" purposes, without informing Marlyn. Peter stated that he had sole control of the accounts and used them as his personal "stash" to shield money from taxes. At the time of the proceeding, the remaining funds from the UGMA accounts totalled $71,659.20 and were held in an account in Peter's name only. Peter made no additional offer of proof.

At the conclusion of the hearing, the trial court granted dissolution, finding that Peter's transfer of the parties' savings to the children in 1980 under the UGMA constituted a fully completed gift. The court stated that Peter's characterization of "tax avoidance" was actually tax evasion, which is illegal. The court found improper Peter's action of transferring the UGMA accounts into his individual name and ordered Peter to return the $71,659.20, plus interest, to Janet and Paul. In addition, the trial court ordered Peter to pay any tax liability incurred by Janet and Paul by virtue of his action of removing assets from their accounts, and to reimburse their accounts for the money he removed out of his share of the proceeds from the sale of the marital residence. The trial court awarded 55% of the marital assets to Marlyn and 45% of the marital assets to Peter, and ordered each party to pay his and her own debts. Judg-

ment for dissolution of marriage was entered on September 5, 1990, reflecting the trial court's findings.

HEARING ON PETER'S MOTION TO RECONSIDER

On October 5, 1990, Peter filed motions to vacate the judgment and to reconsider. The trial court held a hearing on Peter's motions on January 15, 1991, and March 11, 1991. At the hearing, the trial court initially denied Peter's motion to vacate the judgment.

Regarding his motion to reconsider, Peter argued that the trial court failed to consider his evidence at trial rebutting the presumption of a gift under the UGMA. In response, the trial court stated that Peter had the opportunity to present evidence to rebut the presumption of a gift under the UGMA, but that the trial court found the evidence Peter presented insufficient to rebut the presumption. The court found that the only evidence Peter presented to rebut the presumption was Peter's testimony as to his own state of mind, and that Peter made no additional offer of proof. The court stated that it was not persuaded by Peter's rebuttal because his description of his intentions constituted tax evasion and the court did not believe that Peter intended to do an illegal act at the time he created the UGMA accounts. The court further stated that the presumption of a gift was reinforced by the facts that Peter established the UGMA according to the proper procedure, and complied with the appropriate tax requirements for the accounts on his tax returns.

Peter further contested the court's jurisdiction to order him to reimburse the children for the monies he had taken from the UGMA accounts because the children had not intervened as parties in the lawsuit and therefore were not properly before the court. At the conclusion of the hearing, the trial court ruled that it had erred in ordering Peter to reimburse the children any sums of money because it did not have the proper jurisdiction. The trial court found that the account held in Peter's name containing the proceeds from the children's UGMA accounts was no longer a marital asset, but rather belonged to Janet and Paul as a fully completed gift. As such, the trial court deleted its finding relative to tax evasion, as well as that portion of the decree ordering Peter to reimburse the children out of the proceeds of the sale of the marital home. An amended judgment for dissolution of marriage was entered on September 16, 1991, reflecting the trial court's findings.

Following the trial court's denial of his post-trial motion, Peter filed his timely notice of appeal from the amended judgment of dissolution on October 28, 1991.

ATTORNEY FEES PETITIONS

On December 12, 1990, Marlyn filed a petition for attorney fees, but withdrew her petition at the commencement of the hearing on October 17, 1991.

Meanwhile, on October 15, 1991, Peter filed a petition for attorney fees under section 508 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1991, ch. 40, par. 508(a)), requesting that Marlyn reimburse him for all fees paid in connection with the trial and post-trial proceedings. The hearing on Peter's motion for attorney fees commenced on February 5, 1992. At the hearing, William P. Gieseke, Peter's psychotherapist, testified on Peter's behalf that he has been treating Peter since 1986. The trial court ruled that Gieseke was not an expert relative to the diagnosis of mental disorders and thus could not testify as to Peter's alleged emotional condition.

Gieseke testified that Peter complained of depression and paranoia, and that he treated Peter for his behavioral fears including the fears that: he is being followed by previous employers; his phones are tapped; his lawyers and his wife are conspiring against him to take away his money; that people pry into his personal affairs; and that he has a very hard time working because of these fears. Following this testimony the court specifically found that Peter is not a disabled person. Gieseke stated that Peter is currently being treated with medication for depression and anxiety.

Gieseke testified that Peter would like to gain full-time employment, but that because of his fears that supervisors are monitoring him and employees talking about him, he is unsuccessful at maintaining long-term employment. Gieseke stated that Peter does well in temporary work, however, because his fears do not become amplified and do not attach to any specific person. On cross-examination, Gieseke admitted that he never specifically told Peter that he is unable to obtain full-time employment.

Peter testified on his own behalf that he has a bachelor's degree and master's degree in production management and has taken the certified public accountant examination. Peter is currently employed as a temporary accountant at $9.50 per hour and during 1991 he earned a gross annual income in excess of $17,000. Peter stated that his ordinary living expenses total $2,382.18 per month, but

that his current net income of $1,043.16 per month does not permit him to spend money as shown on his expense affidavit. As an illustration, Peter stated that he has not had a haircut in six months, has not taken his clothes to the cleaners in three years, and cannot put any money away for savings. However, Peter stated that he is able to live within the income he is making. On cross-examination, Peter admitted that his income is actually higher than that reflected in his income affidavit and that his expenses are actually lower.

Peter stated his current assets consist of $79,927.24 as his share of the proceeds from the sale of the marital residence, $65,000 of which he used for his appeal bond; an IRA consisting of approximately $22,000; his Searle capital accumulation plan account consisting of $28,000 to $30,000; the Calvert account valued at $78,194.83, which the court designated nonmarital and belonging to the Agostinelli children; and a checking account with a balance of approximately $2,100. In addition, Peter has a savings account held in joint tenancy with his mother, but Peter stated that he did not know the balance of the account and that he cannot use the money for his own purposes.

Peter testified that he paid the following amounts in attorney fees: $1,734.35 to Frederick Lurie, Peter's first attorney; $6,900 to Burton Witt, Peter's trial attorney; $10,500 to Sarane Siewerth for the post-trial matters and the appeal; and $6,000 to $8,000 to Jay Grodner, Peter's attorney for the fee hearings. Peter testified that in order to pay his attorney fees, he borrowed money from his mother and signed notes for repayment terms. When the notes started coming due, Peter borrowed $11,500 against his life insurance policy to pay off some of the notes, but he stated that he still owes his mother some money.

Marlyn testified that she is currently a course instructor for the Management Association of Illinois. As a course instructor, she conducts 8-week, 20-hour training courses. She is contracted by course and paid $560 at the end of the term for each course. As of the date of the hearing, Marlyn had not yet finished her first course and had not yet been paid.

Marlyn testified that she was laid off from her position as office manager for ODI on December 31, 1991, and received severance payments of approximately $3,300. Following her termination, Marlyn was able to continue her insurance benefits under the COBRA program at her own cost of $628.13 per month.

Marlyn stated that as of July 1991 her salary at ODI was approximately $27,000. Marlyn's tax return for 1990 reflected a gross income of $24,020.01 from ODI. Marlyn stated that she cashed in an IRA account in the amount of $6,800 to purchase computer equipment for a word processing business. During 1990, Marlyn earned approximately $5,000 from her word processing business. In addition, she earned $190 from a speaking engagement at the Winnetka Community House, and $1,120 from the Management Association of Illinois.

In January and February 1992 Marlyn received $892.66 monthly in unemployment compensation, but the payments ceased after she notified the government that she had obtained part-time employment. Marlyn testified that she is actively seeking full-time employment.

Marlyn stated that she received $115,000 in proceeds from the sale of her marital home. Of that money, $25,000 remains in an escrow account pending the appeal of this matter, $10,000 was paid to Marlyn's attorney for the appeal, and Marlyn anticipated additional attorney fees of $15,000. Marlyn spent $17,903 to repay credit card and automobile debts and other personal expenses. Marlyn stated that after all her expenses are paid, she will have left approximately $22,000, some of which she must use to pay capital gains tax penalties on the sale of the marital home. Marlyn noted that Peter will not have to pay capital gains taxes on his share of the proceeds from the house because he is over 60 years old and is therefore exempt. Marlyn's additional assets consisted of $3,675 in profit sharing from ODI and $10,208.13 representing her portion of the Searle capital accumulation plan.

Sarane Siewerth testified on her own behalf that she was retained by Peter in the fall of 1990 to handle his motion to reconsider and his subsequent appeal. The court stated that it would only consider the time Siewerth expended through the entry of the amended judgment and would not consider her testimony relative to the fee petition because she was merely a witness and not an advocate on Peter's behalf. The court further stated that it would not consider Siewerth's work on Peter's appeal because that work was not the subject of the fee petition. Siewerth stated that Marlyn negotiated to settle the case, but that Peter chose to try the case. Siewerth stated that her hourly fee was $240 and that she sought fees totalling $10,634.50.

Jay Grodner testified that Peter retained him in August 1991 to defend Marlyn's fee petition and that Peter informed him that he

would be working and consulting with Siewerth. The court stated that although an attorney is not entitled to seek fees as a result of a fee hearing to collect his own fees, he is entitled to seek fees as a result of seeking fees on behalf of his client. Grodner testified that his hourly rate is $175 and that he is seeking a total of $4,197.50 in fees for 32.5 hours expended. The court allowed Grodner to testify to the hours he expended on behalf of Peter beyond his filing of the fee petition. However, Grodner did not testify as to time or fees he incurred as a result of prosecuting Peter's fee petition, stating it was his interpretation that the court would not consider the time compensable.

Following the closing arguments of counsel, the trial court found that Peter is far better educated than Marlyn, and that he is able to earn money, but that he elected not to obtain a job. The trial court considered the parties' assets and Peter's tax-exempt status relevant to the sale of the marital home. The trial court found that Peter failed to establish any basis for which attorney fees could be charged against Marlyn. The trial court therefore denied Peter's fee petition, indicating that Peter had failed to sustain his burden under section 508(a). Peter's timely appeal of the trial court's order denying his petition for attorney fees followed on May 11, 1992, and his two appeals were consolidated by this court.

OPINION

Initially, Peter contends that the trial court erred in deciding that the marital funds used to establish two custodial accounts under the Uniform Gift to Minors Act (UGMA) (Ill. Rev. Stat. 1979, ch. 110½, par. 201 et seq.) (as amended, the Uniform Transfers to Minors Act (Ill. Rev. Stat. 1991, ch. 110½, par. 251 et seq.)) constituted fully completed gifts to the parties' children, Janet and Paul Agostinelli. In its amended judgment of dissolution, the trial court concluded that the funds were not marital property, but rather belonged to the children. Peter argues that the money is in fact marital and must be distributed as part of the marital estate. Peter argues that the trial court failed to consider the fact that the necessary donative intent for the establishment of a gift under the UGMA was lacking at the time he opened the two bank accounts in the names of his minor children.

Sections 2 and 3 of the UGMA provide as follows:

"An adult may, during his lifetime *** provide for a gift of a security or money *** to a person who is a minor on the date of the gift or distribution:

* * *

(3) if the subject of the gift is money, by paying or delivering it to a broker or domestic financial institution for credit to an account in the name of the donor, another adult or a trust company, followed, in substance, by the words: 'as custodian for ... (name of minor) under the Illinois Uniform Gifts to Minors Act.' " Ill. Rev. Stat. 1979, ch. 110½, par. 202(a)(3).

"A gift made in a manner prescribed in this Act is irrevocable and conveys to the minor indefeasibly vested title to the security or money, *** but no guardian of the minor has any right, power, duty or authority with respect to the custodial property except as provided in this Act." Ill. Rev. Stat. 1979, ch. 110 ½, par. 203(a).

In *Heath v. Heath* (1986), 143 Ill. App. 3d 390, 493 N.E.2d 97, this court noted that the UGMA is designed to make an *inter vivos* gift to a minor and that a valid *inter vivos* gift requires proof of donative intent and delivery of the subject matter. (*Heath*, 143 Ill. App. 3d at 394, 493 N.E.2d at 100.) The court then held that documentary compliance with the statutory mechanisms of the UGMA constitutes *prima facie* evidence that a gift was made and intended, but that in appropriate circumstances, extrinsic evidence may be introduced to rebut the *prima facie* showing provided by the prescribed documentation of the Act. *Heath*, 143 Ill. App. 3d at 395; see also *Gordon v. Gordon* (1979), 70 A.D.2d 86, 419 N.Y.S.2d 684; *In re Marriage of Jacobs* (1982), 128 Cal. App. 3d 273, 180 Cal. Rptr. 234; *Golden v. Golden* (Fla. Dist. Ct. App. 1983), 434 So. 2d 978.

██ Here, Peter admitted opening the accounts in the names of his children under the provisions of the UGMA. The documentary evidence of the accounts thus constituted a *prima facie* showing that the accounts were intended to be irrevocable gifts to the named minors under the UGMA. Although Peter argues that he opened the accounts for "tax avoidance" purposes, not for gift purposes, and that he intended to use the accounts as his own personal "stash" to shield money from taxes, Peter's testimony is contradicted by the record. Marlyn testified to a conversation with Peter some time prior to the opening of the accounts wherein Peter stated that it was his intention to put money into savings for the children's education. Marlyn further testified that Peter had separate conversations with each child, informing them of the existence of the accounts. The record further shows that Peter made deposits

into the two UGMA accounts between June 9, 1980, and December 1, 1982, and that he did not withdraw any money from the UGMA accounts until January 24, 1986, the year in which the parties began to have serious marital difficulties. In addition, the record shows that Peter prepared tax returns for both children, claiming UGMA account interest. *Cf. Jacobs*, 128 Cal. App. 3d at 278, 284-85, 180 Cal. Rptr. at 237, 240-41 (both parties testified that throughout the marriage they placed extra money into UGMA accounts to avoid adverse tax consequences and that they treated the money in the accounts as their own).

The burden was upon Peter, as the one questioning the creation of a gift, to overcome the presumption of donative intent by clear, convincing, unequivocal, and unmistakable evidence. (*Heath*, 143 Ill. App. 3d at 396, 493 N.E.2d at 101.) The record shows that Peter was given the opportunity, but failed to overcome the presumption of donative intent.

Regarding Peter's assertion that his ability to overcome the presumption of donative intent was unduly restricted by the trial court, Peter's failure to make any offer of proof during the trial constitutes a waiver of any error on review: "[A] party claiming he has not been given the opportunity to prove his case must provide a reviewing court with an adequate offer of proof of what the excluded evidence would have been." (*Chicago Park District v. Richardson* (1991), 220 Ill. App. 3d 696, 701, 581 N.E.2d 97, citing *Lukas v. Lightfoot* (1985), 131 Ill. App. 3d 566, 476 N.E.2d 1.) In the absence of an offer of proof, the issue of whether evidence was improperly excluded is deemed waived. *Richardson*, 220 Ill. App. 3d at 702.

■ Peter further argues that the trial court improperly denied his request that Marlyn pay his attorney fees. Section 508(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) provides that the court may order either spouse to pay attorney fees incurred by the other spouse after it considers the financial resources of the parties. (Ill. Rev. Stat. 1991, ch. 40, par. 508(a).) The award of attorney fees is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. *In re Marriage of Olbrecht* (1992), 232 Ill. App. 3d 358, 597 N.E.2d 635.

After considering the property distributed to Peter and to Marlyn, and their respective assets and employment potential, the court found that each party should be responsible for his or her own attorney fees. The record does not support Peter's contention that he was prevented from presenting additional offers of proof re-

garding his payment of attorney fees. In fact, the record shows that Peter's counsel elected not to testify regarding certain fees based only on his presumption that the trial court would not entertain such testimony. As such, this issue is waived. See *Richardson*, 220 Ill. App. 3d at 702.

■ Peter's further argument that Marlyn failed to disprove the reasonableness of Peter's attorney fees in reliance on *Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 518 N.E.2d 424, is without merit. In *Kaiser*, this court specifically stated that the burden is on the party seeking the fees to produce detailed facts and computations upon which the claim for fees is predicated. (*Kaiser*, 164 Ill. App. 3d at 975.) Peter has not demonstrated an inability to pay his own attorney fees; therefore, we uphold the trial court's ruling. See *In re Marriage of Madoch* (1991), 212 Ill. App. 3d 1007, 1017, 571 N.E.2d 1029.

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.