2005 VT 72

## Susan Smith Wade v. Mason D. Wade

[878 A.2d 303]

No. 04-045

Present: **Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed July 1, 2005

*Brian K. Valentine* of *Schoenberg & Associates*, Burlington, for Plaintiff-Appellee.

*Lauren S. Kolitch*, Waitsfield, for Defendant-Appellant.

¶ 1. **Allen, C.J. (Ret.), Specially Assigned.** In this appeal from a final judgment of divorce, husband challenges the family court's exclusion from the marital estate money given to the parties' minor child in accordance with the Vermont Uniform Gifts to Minors Act (VUGMA), 14 V.S.A. §§ 3201-3209. Husband also contests the property division as inequitable because the court awarded nearly ninety percent of the marital property to wife. We affirm.

¶ 2. Husband and wife were married in 1991, had one child together, and separated in 2002. The parties, their daughter, and husband's son from a prior relationship lived in the Town of Waitsfield in a home that wife purchased before the parties married. Since 1985, wife used part of the home to run the Sunshine Montessori School, Inc., a nursery school she founded and continues to operate. Husband has a landscaping business. During the marriage husband also took on seasonal work in the restaurant, construction, and ski industries. Over the last four years, husband earned between $13,000 and $23,000 annually. Wife's income from the Sunshine School averaged $21,824 in 2000-2002.

¶ 3. In 1996, wife received a series of gifts from her mother. She was given title to her mother's home, which wife rented out until 2002 when she sold the property. Wife also received $22,000 in cash and put $40,000 from her mother into a VUGMA account for the parties' minor daughter. The $22,000 gift to wife went into an account in her name only. Wife subsequently exhausted the money in the account by using it to pay for various family expenses. At the time of the divorce hearing, the VUGMA account had a $25,000 balance. Wife testified that she spent approximately $18,000 from the VUGMA account for family expenses, including her own medical expenses.

¶ 4. After wife sold the home her mother gave her in 2002, the parties each received $10,000 from the proceeds. The remaining proceeds of $59,000 were placed into escrow pending distribution in the divorce proceeding. After her mother died, wife used some of her inheritance to purchase a twenty-nine foot sailboat and a catamaran for the family. Husband spent time repairing and maintaining the boats for the family, and used his carpentry and other handyman skills to maintain and improve the parties' residence. The family also owned a camper,

and husband held a half interest in a seasonal camp in Rochester, Vermont.

¶ 5. Throughout the marriage, wife paid the mortgage on the marital residence and most of the household expenses. Husband paid half of the household utilities and charged many of his own expenses, and those of his landscaping business, to credit cards. At the time the parties separated, husband had over $23,000 in personal and business credit card debt. Wife's credit card debt was a fraction of husband's. After separating, wife remained in the marital home, and husband moved into a friend's home where he acts as caretaker.

¶ 6. Wife filed for divorce in October 2002. She sought primary custody of the parties' daughter and most of the parties' property, although wife agreed that husband and their daughter should have liberal contact. Husband wanted a shared parenting arrangement — one week every other week — and asked the court to split their property roughly fifty-fifty. Both parties hired expert witnesses to testify about the value of the Sunshine School. It was undisputed that husband's business had no value.

¶ 7. The court issued a written order following a hearing in December 2003. Wife received approximately ninety percent of the marital property, including the parties' home and all of its equity, the catamaran, the camper, and the escrowed proceeds from the sale of her mother's home. The court awarded husband the sailboat, $10,000 from the sale proceeds that he had already received, his interest in the Rochester camp, and his tools. Crediting wife's expert witness, the court found that the Sunshine School, while valuable to wife personally, had no market value. The court also concluded that the VUGMA account was not subject to distribution because it was the property of the parties' daughter. As to parental responsibilities for the minor child, the court adopted the arrangement set forth in the parties' stipulated temporary order, which allowed the child to spend overnights with husband every Wednesday and every other weekend from Friday until Monday morning.

¶ 8. In support of the property award, the court explained that wife had lived in the parties' home since 1985, six years before the parties' married. Wife paid the mortgage and property taxes. She also paid for the parties' two boats and contributed all of her income to other household expenses. The court acknowledged that what money husband earned was spent primarily on the household, but it noted that husband "never earned much in any year." The court found that husband had not "followed a conventional career; instead he has enjoyed

the freedom of working on a seasonal basis and taking time when he wishes to work on his own business." The court found that husband could earn more money working a full-time job in construction or some other business if he chose.

¶ 9. In his appeal, husband first claims that the court should have distributed the VUGMA account because it was part of the marital estate. He argues that wife never executed any trust documents to establish an irrevocable account for their daughter, and that she used the money for her own purposes. Therefore, husband contends, the funds in the account are marital property subject to distribution in the divorce. The family court's fact findings on the VUGMA account will stand on appeal if they are supported by any credible evidence in the record. *Hayden v. Hayden*, 2003 VT 97, ¶ 14, 176 Vt. 52, 838 A.2d 59. We will uphold the court's legal conclusions if supported by the findings. *Payrits v. Payrits*, 171 Vt. 50, 53, 757 A.2d 469, 472 (2000).

¶ 10. Contrary to husband's claim, establishing a VUGMA does not require the execution of trust documents to make the gift irrevocable. The VUGMA's purpose is to provide a simple procedure for gifting property to minors. See *In re Marriage of Hendricks*, 681 N.E.2d 777, 781 (Ind. Ct. App. 1997) (construing Indiana's Uniform Gifts to Minors Act). For cash gifts, the Act requires only that the donor pay or deliver the money "to a broker or a bank for credit to an account in the name of the donor, another adult person, an adult member of the minor's family, a guardian of the minor or a bank with trust powers, followed, in substance, by the words: 'as custodian for (name of minor) under the Vermont Gifts to Minors Act.'" 14 V.S.A. § 3202(a)(3). Once made according to statutory procedures, the gift is irrevocable, and the child possesses an indefeasible interest in the property held in the VUGMA account. *Id.* § 3203(a); *In re Marriage of Hendricks*, 681 N.E.2d at 781; *In re Marriage of Agostinelli*, 620 N.E.2d 1215, 1220-21 (Ill. App. Ct. 1993). The account's custodian has authority under the Act to spend "so much of or all the custodial property as the custodian deems advisable for the support, maintenance, education and benefit of the minor." 14 V.S.A. § 3204(b). Because the funds in a VUGMA are the child's property, they are not part of the marital estate subject to equitable distribution in a divorce proceeding. *In re Marriage of Agostinelli*, 620 N.E.2d at 1221.

¶ 11. To prevail on his first claim, therefore, husband must demonstrate that the record lacks evidence supporting the court's finding that the account was created in accordance with the VUGMA.

Because the record supports the court's finding, husband's claim must fail. The $40,000 check that wife's mother wrote to fund the account was admitted into evidence. The check was payable to an investment firm and not to wife. On the check, wife's mother wrote the child's name and indicated that it was for a VUGMA account. Wife also introduced the account statements she received as custodian of the VUGMA account. The statements identify the account as a VUGMA account, they name wife as the account's custodian, and they identify the parties' child as the account holder. That evidence, in addition to wife's testimony about the account, provide ample support for the court's findings on this issue.

¶ 12. Wife's alleged misuse of the funds in the account does not transform the child's property into the property of her parents. To the extent that wife violated her obligations as custodian on the account, the VUGMA provides a different remedy in a different forum. The probate court, not the family court, has jurisdiction over VUGMA accounts, 4 V.S.A. § 311; 14 V.S.A. § 3201(4), and it may require the custodian to provide an accounting of all deposits to, and expenditures from, the account. 14 V.S.A. § 3208. The probate court may also remove and replace the custodian for cause, *id.* § 3207(d), (e), and may hold the custodian liable for losses to the account resulting from intentional wrongdoing, gross negligence or actions taken in bad faith. *Id.* § 3205(e). The family court correctly decided to exclude the account from the marital estate because it was not marital property, and the court had no jurisdiction over its management in light of the governing statutes.

¶ 13. Husband next argues that the court awarded a disproportionate share of the marital property to wife by ignoring some of the statutory factors in 15 V.S.A. § 751 and giving too much weight to others. Section 751 of Title 15 directs the family court to divide the marital estate in an equitable manner after considering several factors:

(1) the length of the marriage;
(2) the age and health of the parties;
(3) the occupation, source and amount of income of each of the parties;
(4) vocational skills and employability;
(5) the contribution by one spouse to the education, training, or increased earning power of the other;
(6) the value of all property interests, liabilities, and needs of each party;

(7) whether the property settlement is in lieu of or in addition to maintenance;

(8) the opportunity of each for future acquisition of capital assets and income;

(9) the desirability of awarding the family home or the right to live there for reasonable periods to the spouse having custody of the children;

(10) the party through whom the property was acquired;

(11) the contribution of each spouse in the acquisition, preservation, and depreciation or appreciation in value of the respective estates, including the nonmonetary contribution of a spouse as a homemaker; and

(12) the respective merits of the parties.

15 V.S.A. § 751(b). The family court has broad discretion when analyzing and weighing the statutory factors in light of the record evidence. See *Lalumiere v. Lalumiere*, 149 Vt. 469, 471, 544 A.2d 1170, 1172 (1988) (explaining that family court has wide discretion in equitably dividing marital property and noting that court's task is not an "exact science"). When fashioning an equitable award, the court must explain the underlying rationale for its decision, *Cabot v. Cabot*, 166 Vt. 485, 500, 697 A.2d 644, 654 (1997), which we will not disturb absent a showing that the court abused its discretion. *Weaver v. Weaver*, 173 Vt. 512, 513, 790 A.2d 1125, 1127 (2001) (mem.).

¶ 14. Husband asserts that the property division lacks equity because the court did not consider the length of the marriage; husband's lack of a college education and his contributions to wife's business; husband's credit card debt; the lack of maintenance for husband where wife earns more than him; husband's inability to acquire capital assets or additional income; husband's sweat equity in maintaining and improving the marital home and the rental property acquired from wife's mother; and the lack of a proper home for their daughter when she spends time with husband. We find no merit to husband's contention because the text of the court's decision reflects that it considered all of those factors.

¶ 15. The court found that the parties were married for twelve years. It determined that in light of all of the factors the length of the marriage did not weigh in favor of either party. The court acknowledged husband's lack of a college degree, but it found that husband could increase his annual income by taking a full-time position in the construction industry or in another industry in the Mad River Valley. Husband is healthy and his age — forty-eight-years old at the time of

the divorce — did not preclude him from acquiring his own home or other assets in the future. On the issue of maintenance, husband did not request maintenance in lieu of property, and cannot now fault the family court for not considering this factor.

¶ 16. As for husband's suggestion that the property award left him without an ability to obtain a suitable residence where his daughter can stay when she is in his care, there is no factor in § 751 that directly addresses this issue. Under § 751(b)(9), the court must consider the "desirability of awarding the family home ... to the spouse having custody of the children." 15 V.S.A. § 751(b)(9). The court considered that factor when it determined that the child's best interests were served by allowing her to remain in the marital residence — the only home the child has ever known — under wife's primary care.

¶ 17. According to the family court, the statutory factors that weighed most heavily in its decision were numbers (10) and (11): through whom the assets were acquired, and which party contributed more to their preservation. *Id.* § 751(b)(10) & (11). All of the assets in this case came through wife, either because she acquired them before the marriage or purchased them after marriage with money wife's mother provided. All of wife's income, as well as her inheritance, went to support the family and the family's recreational interests. She paid the mortgage and property taxes on the marital home. Husband's financial contribution to the marriage was recognized through the $10,000 he received from the sale of wife's mother's home and the sailboat the court awarded husband. The court declined to allocate the parties' debt because it found that husband's larger share of credit card debt was due to the relatively low income he earned by choice. In light of wife's substantial monetary contribution to the family's expenses, the court determined that it would be unfair to saddle her with a portion of husband's personal and business debt.

¶ 18. The dissent would ignore the family court's discretion in this case and find the court's division of marital property "facially inequitable" because of the ninety-ten split in a twelve-year marriage. Neither of the two cases that the dissent relies on provides any support for this position. In *Dreves v. Dreves*, 160 Vt. 330, 628 A.2d 558 (1993), we reversed, based on lack of sufficient findings, a property division in a six-year marriage that gave the wife approximately twelve percent of the marital property. We never suggested that such an award was facially invalid, however. Rather, we found inadequate the family court's bare explanation that most of the assets in the brief marriage were originally attributable to the husband, given the court's

findings that (1) the wife left her home state and her employment to join her husband; (2) she withdrew from the workforce, with the husband's approval if not desire, and served as a homemaker during the marriage; (3) her earning capacity was considerably less than the husband's; and (4) she would have the expense of finding a suitable place to live. *Id.* at 334, 628 A.2d at 560. We concluded that, given these facts, a remand was necessary to get a more detailed explanation of why there was such a great disparity in the property division. *Id.* at 335, 628 A.2d at 561.

¶ 19. Similarly, in *Harris v. Harris*, 162 Vt. 174, 647 A.2d 309 (1994), we reversed a property division in a seven-year marriage that gave the wife just eight percent of the marital assets. Noting that the only tenable explanation for the great disparity in the property division was that most of the assets had come from the paternal grandfather, we pointed out that (1) the grandfather had given the husband land to build a home in anticipation of the parties' marriage; (2) both parties had worked on the home; (3) the home was financed by a mortgage that had been gradually reduced throughout a marriage in which the wife withdrew from the workforce and served as a homemaker to care for the children while the husband gained earning power; and (4) at the time of the divorce, the wife, who needed to find suitable housing for her and her daughter, was just reentering the workforce at minimum wage after a seven-year absence. *Id.* at 183-84, 647 A.2d at 315.

¶ 20. These cases do not hold that a large disparity in a property division is facially inequitable. Rather, at most, they stand for the proposition that we will carefully examine the evidence and findings to assure that the family court made adequate findings and acted within its wide discretion in awarding one spouse the vast majority of the marital assets. Notwithstanding the dissent's attempts to compare this case to *Dreves* and *Harris*, the evidence and findings here, which reasonably support the family court's decision, are starkly different from the evidence and findings in those cases. The major assets in this relatively small marital estate were the family home and funds that came from wife's mother. The court gave the vast majority of these assets to wife because (1) wife had owned and lived in the marital home for six years before the parties married; (2) wife had paid most of the home expenses during the marriage, including all of the mortgage payments and property taxes; and (3) wife had contributed nearly all of her income, including much of her inheritance, to household needs and common family interests. The court acknowledged husband's sweat equity in the marital home, but concluded that the home should be

awarded to wife in its entirety, given that wife had owned it for many years before the marriage and had contributed a disproportionate amount of finances to its upkeep throughout the marriage.

¶ 21. Further, notwithstanding the dissent's claims to the contrary, husband cannot be considered a displaced homemaker, as were the wives in *Dreves* and *Harris*. There is no evidence, no findings, nor even any claim by husband, that he left the workforce to serve as a homemaker, or that he was the primary care giver during the marriage. To the contrary, the family court found that husband was a skilled carpenter and landscaper who chose a lifestyle that provided little income but allowed him to work on his own terms. In so finding, the court was not discriminating against husband, as the dissent suggests, but rather explaining why it was equitable to award the vast majority of the marital assets to wife, considering that this was not a long-term marriage and that she brought most of those assets into the marriage. We find this explanation reasonable and within the court's wide discretion in allocating marital property.

¶ 22. Moreover, we expressly reject the dissent's claim that the family court failed to give husband sufficient financial resources to allow him to obtain and maintain a place to live so that he can share physical responsibilities for his daughter. There are no findings nor any evidence in the record suggesting that father is not capable of obtaining housing that would allow him to share physical responsibilities for the parties' daughter. In any event, husband has not even challenged the family court's order on parental rights and responsibilities.

¶ 23. We recognize that wife received approximately ninety percent of the parties' assets. Had the family court failed to explain in detail the reasons for the facially disproportionate property distribution, the outcome of this case would likely be different. But the family court carefully explained why it weighed factors (10) and (11) more heavily in reaching its decision. As trier of fact, the family court was in the best position to assess the merits of the parties' contentions, and its decision addresses the relevant statutory factors. Therefore, we cannot say that the court abused its discretion in fashioning the property award in this case.

¶ 24. Husband next argues that the court erred by finding that the Sunshine School had no market value. He asserts that the business was an ongoing concern, it provided wife a reasonable income, and its gross sales and net profit were experiencing an upward trend at the time of the divorce proceeding. Again, we review the court's finding on

this issue for clear error. *Hayden*, 2003 VT 97, ¶ 14. So long as the court's findings are grounded in the evidence, even if substantial contrary evidence exists, the findings will stand on appeal.

¶ 25. The Sunshine School's value was the subject of competing expert testimony at trial. Wife's expert testified that the school lacked excess cash flow and thus had no market value. Husband's expert criticized the methodology wife's expert used, but conceded on cross-examination that his opinion might change if the assumptions he made about enrollment and the base salary for wife were different. The court found that the business has value to wife because it provides her with a modest livelihood and personal fulfillment. But, the court noted, wife's average income from the school over the last three years was less than the average salary for a preschool teacher. That fact, combined with the school's location in wife's home, reduced the market value of the business to zero. The court found that "[a]ny purchaser of the business who paid a reasonable rent — estimated by [husband's] business appraiser at $8,000 per year — and hired a pre-school teacher to replace [wife] would lose money even if the sales price was $1.00." Husband has not demonstrated that the court's decision on this issue lacks support in the record.

¶ 26. Husband's last claim relates to the court's findings on the value of the marital residence in 1991 when the parties married. The home's 1991 value is relevant only to its appreciation during the marriage and what share of that appreciation should go to husband. As husband conceded at oral argument, however, this claim is moot if the Court affirms the overall property award, which we have done. Accordingly, we decline to address this issue because it has no bearing on the outcome of husband's appeal.

*Affirmed.*

¶ 27. **Skoglund, J.,** dissenting. "The purpose of discretion is not to foster inconsistency." *Klein v. Klein*, 150 Vt. 466, 473, 555 A.2d 382, 386 (1988). Thus, different judges addressing discretionary matters in similar cases ought to arrive at similar results. Our prior cases suggest that the lopsided award in this case would never be affirmed if it had been wife and not husband who received the paltry ten percent share of the parties' marital estate. Here, both spouses earned less through their labors than their potential would permit, but the trial court faulted only husband for his failure to follow a "conventional career" path. Perhaps more importantly, the court's award leaves husband with questionable financial ability to find and maintain suitable housing

for himself and his daughter after the divorce, even though the court found it in the child's best interests that parental rights and responsibilities be shared by the parties. To me, the inequity in the trial court's award under the facts here, and in light of our prior decisions, is apparent on its face. I must, therefore, dissent.*

¶ 28. I do not disagree with the majority that the family court enjoys broad discretion to determine what is equitable when dividing a divorcing couple's property. But the family court's exercise of discretion must, in the end, achieve an equitable result. In a twelve-year-long marriage, a 90/10 split of marital property is facially inequitable. See *Harris v. Harris*, 162 Vt. 174, 647 A.2d 309 (1994) (reversing judgment awarding wife only eight to twelve percent of marital property in marriage of seven years); *Dreves v. Dreves*, 160 Vt. 330, 628 A.2d 558 (1993) (reversing judgment awarding wife eighteen percent, compared to husband's eighty-two percent, of marital estate in six-year marriage). Such a great disparity in the property awarded each spouse in a marriage of this length demands that this Court examine the equities more closely to assure that the result is just. *Harris*, 162 Vt. at 184, 647 A.2d at 316 (citing *Daitchman v. Daitchman*, 145 Vt. 145, 150, 483 A.2d 270, 273 (1984)).

¶ 29. Such a close examination convinces me that the equities here are not just and, as in similar cases, would support reversal. As the majority acknowledges, the family court weighed two statutory factors more heavily than others in its decision: (1) the party through whom the property was acquired, and (2) the contributions of each spouse to the maintenance and preservation of the parties' property. 15 V.S.A. § 751(b)(10), (11). Reasoning that those factors were the most important in this case, the family court gave no weight to the length of the marriage, and it discounted husband's financial and in-kind contributions to the household and to the maintenance of valuable marital property. *Id.* § 751(b)(1), (11). The family court's findings, and the record supporting them, indicate that husband contributed to the maintenance of the marital home and the rental property gifted by wife's mother. He performed renovations that permitted wife to run the Sunshine School from her home. The family court's decision notes

---

* I do not disagree with the Court's analysis of husband's claim regarding his daughter's Uniform Gifts to Minors Act account. My dissent relates solely to the glaring inequity in the family court's property apportionment given its findings and its award of parental rights and responsibilities.

those contributions, but gives them virtually no weight in its decision. That was reversible error in my view.

¶ 30. In *Dreves v. Dreves*, the Court reversed a similar award, which, in contrast to this case, gave most (eighty percent) of the property to husband rather than to wife. The family court's only reasons for the disproportionate award in *Dreves* were the short length of the marriage, six years, and the fact that virtually all of the parties' assets were attributable to husband. 160 Vt. at 334, 628 A.2d at 560. The Court reversed. Holding that the family court did not adequately explain the facially inequitable judgment, the Court chastised the family court for not weighing more heavily wife's lower earning capacity and her need to find alternative living arrangements after the divorce. *Id.*

¶ 31. Similarly, in *Harris v. Harris*, the Court reversed an award that gave wife only eight to twelve percent of the parties' property. The parties in *Harris* were married for only seven years, five years fewer than the parties in this case. Like husband here, Mrs. Harris brought no property to the marriage. And, like wife and her mother in this case, Mr. Harris and his family were the source of most of the parties' property. On appeal, the Court held that the property's origin alone is not enough to warrant a one-sided award when other factors were present. 162 Vt. at 183, 647 A.2d at 315. For example, the Court explained, Mrs. Harris worked as a homemaker during the seven-year marriage, but she was given no credit for that contribution to the family. *Id.*

¶ 32. This case is not meaningfully different from cases like *Harris* and *Dreves* involving a displaced homemaker where the spouses decide to allocate their time and labor in a manner that allows one spouse to pursue a career. Like a homemaker, husband spent his time caring for the parties' minor daughter and making in-kind contributions to the family's welfare. The family court found that during the marriage husband contributed most of his earnings to pay a share of the parties' household expenses, even though it also found that he never earned very much. The court found that husband had to charge some of the family's expenses to his credit cards because of his low earnings. Husband invested sweat equity to improve the marital home for use as a school, thereby contributing to wife's professional development. Husband spent both money and time working on the sailboat wife purchased with funds that her mother gave her. Husband's active participation in caring for the parties' minor daughter was the reason the court ordered the shared parenting arrangement. Husband has

limited education in comparison to wife, and he suffers from a learning disability. At nearly fifty-years old, husband has a work history consisting mostly of seasonal labor. While the court found husband "receives compensation for his work on the house through the $10,000 he has already received from the sale of [wife's] mother's house," $10,000 for twelve years of contributions to the marriage and family cannot seriously be considered equitable. Husband's contributions to the family's well-being cannot have been properly factored into the property award.

¶ 33. The only meaningful differences between the circumstances of this case and the circumstances leading to the Court's reversal of the property division for the homemakers in *Dreves* and *Harris* are: (1) the parties here were married for nearly twice as long as the couples in *Dreves* and *Harris*, and (2) the family court in this case shortchanged husband and not wife. The first difference should presumably weigh in favor of giving husband a greater share of the parties' property under the theory that the longer the marriage, the more entitlement each spouse has in the other's property. The second difference is one that concerns me.

¶ 34. Husband and wife together chose a lifestyle in which both parties earned less than their potential. The family court viewed husband's lifestyle and under-earnings differently from wife's without any rational explanation, however. The court's negative view of husband's lifestyle is most apparent in the court's discussion of the parties' education and employment histories. The court explained that husband decided not to pursue a "conventional career," rather he worked on a "seasonal basis and taking time when he wishe[d] to work on his own business." It denied husband a share of the $128,000 of equity in the marital home because, in the court's view, husband's career choices "d[id] not entitle him to a share of the equity." The family court observed that husband could make more money by working full time doing construction or some other work in the Mad River Valley. It made no findings, however, on how much more money husband could earn in light of his age, limited education, dyslexia, and seasonal work experience.

¶ 35. In contrast, the family court characterized wife's employment and earning decisions in a positive light. The court found that wife has a college degree in psychology and arts and is a certified Montessori teacher. The court found that on average a preschool teacher earns more than wife does running her own school at home. It also found that wife's business has no value, and, in fact, would lose money if she were

to relocate the school to another building. The court explained that wife's chosen path provided her with a living and that it "fulfills her personal interest in childhood education." The court fails to explain why it treated these similarly situated parties differently, and no rational reason to do so is apparent from the record.

¶ 36. The award here also fails as a sustainable exercise of discretion because it gives husband shared parental rights and responsibilities but does not give him sufficient financial resources to obtain and maintain a place to live so he can share physical responsibilities for his daughter. Cf. *Harris*, 162 Vt. at 183-84, 647 A.2d at 315 (reversing a property award in part because the family court failed to consider wife's need to find a suitable place to live for herself and her daughter after the divorce). The family court found that husband's living arrangements are fine for him, but not for the child. The court was well aware of the shared parenting arrangement that called for husband to care for the child nearly forty percent of the time. The family court appears to have overlooked husband's concern about finding a suitable place to live with his daughter after the divorce. On appeal, the majority rejects husband's argument on this point, explaining only that § 751(b) neither forbids nor requires the family court to consider husband's post-divorce living circumstances. *Ante*, ¶ 16. When divorcing parties and the family court agree that it is in the child's best interests to share parental rights and responsibilities, and the court finds that one parent does not live in conditions suitable for that child, equity demands that, to the extent possible, the family court apportion the marital property so that both parents can achieve stable and suitable housing for themselves and their child after the divorce. That principle is especially applicable where, as here, there is sufficient property to make possible appropriate living arrangements for both parties.

¶ 37. I do not favor giving undue scrutiny to the discretionary decisions our trial courts are responsible for making, decisions they make hundreds of times each day. And, I believe that the party seeking reversal of a family court judgment under the abuse-of-discretion standard has a very high hurdle to overcome. Here, husband has plainly overcome that hurdle. The family court's decision in this case places far too much weight on wife's financial contributions to the marital estate where other factors were present, just as the family court did in *Harris* and *Dreves*. Moreover, it is apparent that the ninety/ten split in wife's favor arises in great part from the family court's negative view of husband's under-earning, a view the court

notably did not hold about wife's similar history of under-earning. Finally, the award leaves the parties' daughter with no suitable place to live when father has physical responsibility for her under the shared parenting arrangement, an arrangement that all agree is in the child's best interests. For those reasons, the property division in this case is inequitable and I would reverse the judgment. I am authorized to state that Justice Johnson joins in this dissent.