2009 VT 23

**Linda Drumheller v. Philip Drumheller**

[972 A.2d 176]

No. 07-108

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 6, 2009

*Karen McAndrew* of *Dinse, Knapp & McAndrew, P.C.,* Burlington, for Plaintiff-Appellee/Cross-Appellant.

*Robert F. O'Neill* and *Megan J. Shafritz* of *Gravel and Shea,* Burlington, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Dooley, J.** In this contested divorce action, husband challenges several aspects of the family court's division of marital property, arguing that: (1) the court exceeded its authority by reversing, sua sponte, its valuation of husband's interest in a real

estate partnership; (2) the court's valuation of the property was not supported by the evidence; (3) the court erred in not applying a minority discount to the value of husband's interest in the partnership property; (4) the court erred in refusing to consider tax consequences in its valuation of husband's partnership interest and the marital home; and (5) the court's decision to award wife attorney's fees was an error of law. Wife cross-appeals, challenging the court's maintenance award, the valuation of husband's stock in The Lane Press, Inc. (Lane Press), and the court's determination that the education savings funds do not constitute marital property. We reverse and remand the determination that the education savings funds are not marital property; we affirm in all other respects.

¶ 2. Most of the relevant facts are undisputed. The parties were married in 1981 and lived together until the summer of 2004; they raised three children together in that period, one of whom was still a minor at the time of the separation. In September 2004, wife filed for divorce. The primary issues for the family court were the division of marital property and the determination of spousal maintenance.

¶ 3. The parties' largest disagreements concerned husband's interest in Lane Press and his one-third partnership interest in Landrum LLP. Lane Press is a printing business, located in South Burlington, Vermont, that specializes in printing magazines. Lane Press employs approximately 250 people and prints and distributes approximately the same number of magazines. Husband is the chief executive officer of Lane Press, which was previously owned by his father and operated by his brothers. In 1974, husband's father set up an employee stock ownership plan (ESOP) in order to reduce his own tax liability and to serve as a retirement plan for Lane Press employees, who have the opportunity to sell their shares at a fixed price at the conclusion of their employment. The ESOP holds 89.72% of the Lane Press shares, and husband owns the remaining 10.28%. Husband owns some of the ESOP shares and is the ESOP plan administrator, with the power to direct the actions of the ESOP, except with respect to major decisions such as a sale or merger of Lane Press.

¶ 4. At trial, the parties disagreed about the valuation of Lane Press for the purposes of the marital estate, and each side presented expert testimony on the per share value of these

shares. Husband's expert, Robert Ireland, had annually valued Lane Press for the last twenty years in order to set a value of the ESOP shares for the purposes of employee retirement. Wife's expert, Joseph Egler, also had extensive experience in the valuation of businesses in general and ESOPs in particular. Although they reached different results, Ireland and Egler both calculated the value of husband's interest in Lane Press by using three independent methods: (1) income capitalization; (2) asset value; and (3) comparison with publicly traded companies in the same industry. With respect to the income capitalization method, both experts arrived at a value of roughly $7 million to $7.5 million, and both agreed that this valuation was too low, given the before-tax profits of the company in the five years preceding.

¶ 5. Consequently, each expert turned to alternative methods of valuation. Egler considered the net asset value of Lane Press by aggregating Lane Press's cash and cash equivalents with the book value of its equipment, less the company's liabilities. The court did not find this method of valuation to be helpful, explaining that "[t]he trouble with the net asset value is that it depends on tax depreciation schedules which have little relation to the market value of the equipment and other assets."

¶ 6. The experts then turned to "guideline company" measurements. This approach, as the court explained, "compares The Lane Press to publicly traded companies in the same industry whose values are known because their share prices are published every day." There were some differences in the method of each expert. In particular, Ireland put greater weight on the results drawn from smaller companies, whereas Egler calculated a straight average based on the results of five companies irrespective of size. The experts also applied different discounts, Egler's due to the fact that husband held only a minority of shares in Lane Press, Ireland's because Lane Press is a closely held company and its shares do not have complete liquidity.

¶ 7. Overall, the court was persuaded by Ireland's valuation of Lane Press. The court explained that it was "primarily persuaded in Mr. Ireland's favor by his focus on income capitalization and the length of his involvement with The Lane Press." The court elaborated further:

> Income capitalization appears to the court to be the most accurate way to measure the value of The Lane Press for

two reasons. First, measures which depend on book value are inherently unreliable unless the book values are shown to be equal to actual market value for the assets in question. The court has previously discussed this problem. Second, the guideline analysis in this case seeks by necessity to compare a small pool (5 or 6) of large publicly traded companies with a much smaller closely held corporation. By analogy, with enough adjustments for size and location, it is possible to compare a country cottage with Buckingham Palace for purposes of real estate valuation, but the integrity of the exercise suffers as the differences between the two properties widens. . . .

In addition, Mr. Ireland has some twenty years of experience in valuing The Lane Press. It is unlikely that management selects Mr. Ireland every year in order to maximize the value of the company for the benefit of retiring employees. To the extent there is an institutional bias, it is in favor of keeping ESOP values down to a manageable level. Nevertheless, Mr. Ireland brings an outside professional perspective to the valuation every year. His calculation of share values over 20 years show[s] a relatively steady increase . . . . The length of this experience adds credibility to Mr. Ireland's testimony.

Mr. Ireland's testimony is also bolstered by the minimal use of the minority/liquidity discounts. . . . [T]he use of higher discount figures tends to push the appraisal values towards the realm of theory and away from actual life experience. In the real world, after all, these shares are not going to be sold. [Husband] has to hold on to them because he needs to control the company in order to earn his income. Starting with a higher figure and discounting it by 30% is inherently less persuasive than starting with a lower figure and discounting it by only 10%.

¶ 8. The court next considered the value of Landrum LLP, a partnership in which husband and his two brothers each own a one-third interest. Landrum owns a large building and land that it leases to Lane Press. Both sides presented the testimony of real estate appraisers as to the value of the Landrum interest. Both experts relied primarily on an income capitalization method,

but came out with different answers based on slight differences in their methodology. Husband's expert did not consider the rent actually received by Landrum because the lease was not an arm's-length transaction and therefore did not reflect the actual rental value of the property. Instead, husband's expert considered the amount of rent that the property would generate if another tenant were in place. Wife's expert relied instead on the actual lease terms to calculate the income stream for the property. Wife's expert then assumed a 5% vacancy rate in the rental property and that Lane Press would remain a tenant on the same terms.

¶ 9. The court accepted the reasoning of husband's expert, stating:

> In assigning values to the various assets, the court has to use the same standard of measurement — fair market value — consistently. The exercise requires a certain amount of fiction. As a practical matter, it is unlikely that within the foreseeable future The Lane Press will move from its present location and that Landrum will be faced with the task of refitting the structure to accommodate three tenants. Once the appraiser makes the commitment to arriving at fair market value, however, it is necessary to identify the highest income which the property can generate when offered to tenants in an arm's-length transaction.

¶ 10. Although the parties had other valuable real and personal property, there were no other valuation disputes. Most importantly, the parties agreed that the marital residence had a net equity value of $2,775,000.

¶ 11. The court then moved on to the consideration of the statutory factors pertaining to property division in 15 V.S.A. § 751. Based on its analysis of the statutory factors, the court decided to equally distribute the marital assets.

¶ 12. The court then considered the amount of maintenance it would award to wife. First, it concluded that wife "lacks sufficient income, property or both to provide for her reasonable needs and is unable to support herself at the standard of living established during the marriage." In calculating the necessary amount of maintenance, the court assumed that wife could invest her $1.387 million portion of the equity in the marital home in a new home without taking on a mortgage. The court then looked at the

annual after-tax expenditures of the parties over the last five years of the marriage, an amount the court estimated at $256,000 per person per year. The court then reduced that amount by the mortgage payments wife presumably would no longer be paying, the expected earnings on her marital property award, and her imputed annual employment earnings to obtain, as a final number, a $221,000 annual maintenance award, to be paid yearly over a ten-year period.

¶ 13. Both parties thereafter moved for amendment and reconsideration of the divorce decree. Husband argued that the court should reconsider the portions of its decision regarding the Landrum property, asserting that "when one considers the debt on the Landrum property and the taxes on the capital gains as well as the unequal risk associated with a cash distribution to [wife] and an asset distribution to [husband], the division is not equal." Husband also pointed out that the court failed to reduce the value of the Landrum property by the amount of the mortgage on the property, and also that the mortgage amount was $1.2 million, not $1.7 million, as contained in the court's decision.

¶ 14. In addition, husband argued that the court's distribution of property was erroneous insofar as it did not take into account the tax consequences of the likely sale of the marital home. In husband's view, wife's share of the equity in the marital home should have been reduced by half of the tax liability caused by the likely sale — $163,500. Similarly, husband argued that the court should reduce wife's property award for shares in Lane Press and the Landrum interest by the tax liability on a sale of those properties. Husband also claimed that the court should require wife to leave the marital home sooner than was ordered.[1]

¶ 15. Husband also addressed the order with respect to the college education savings accounts. The court ordered that the college funds "will remain in a joint account for use in paying tuition and other educational expenses for the three daughters." Husband argued that the monies in these accounts had "never been in a joint account" and had in fact been funded exclusively by husband's parents. Husband argued that these monies had been transferred to "529 Plan College Bound Funds" in April 2001 and labeled "[t]rust FBO" on behalf of husband for each of his

[1] The latter claim was rejected by the trial court and was not challenged on appeal.

three daughters. Wife, husband argued, was the successor trustee of these accounts only in the event of husband's death. Because no marital property was ever added to these accounts, husband asserted, the accounts should not be considered marital property.

¶ 16. Finally, husband addressed the issue of attorney's fees, asserting that "[b]ecause of the lopsided nature of fees in this matter," the court should require each side to be responsible for its own costs and fees or ask wife to show that her own fees and expenses were reasonable.

¶ 17. Wife responded in kind, filing a motion to amend "only with respect to the Court's division of the couple's personal property," arguing that the division of personal property heavily favored husband.

¶ 18. In a decision dated January 2, 2007, the court granted husband's motion in part and decided independently that the Landrum property should be revalued. The court began by addressing and rejecting wife's arguments about the division of the personal property, and that portion of the court's ruling is not challenged here. Next, the court agreed with husband that the mortgage deduction originally applied to the Landrum property was incorrect and should have been $1,355,535.70. The court also added that it had "reconsidered the issue of valuation of the Landrum property" and set out findings of fact on that issue.

¶ 19. In the supplemental findings of fact, the court reconsidered the relative strengths and weaknesses of each expert's opinion on the valuation of the Landrum interest. The court acknowledged the strengths of the opinion of husband's expert but stated that the opinion also had "significant weakness." The court reasoned that the opinion "ignore[d] . . . the actual experience of the Landrum partnership," especially the fact that it was unlikely that "The Lane Press will leave its present location or that the building will be refitted for use by three new tenants." By comparison, the court then reassessed the strengths of the opinion given by wife's expert. The court found that this valuation was ultimately the most credible because: (1) it was "based on an assumption that The Lane Press will continue to occupy the lease space through the end of the current lease period in 2013," and that "[i]t is extremely likely that this will occur"; and (2) the approach "tend[ed] to reduce the likelihood of error" because capitalized income was calculated on a year-to-year basis and projected income was reduced to present value. The court further

held that there was no rule of law prohibiting the court from relying on a valuation derived from a lease not negotiated at arm's length. The only limit applied to such a method, the court reasoned, came from the Uniform Standards of Professional Appraisal Practice, which provides in pertinent part that an appraiser must "analyze such comparable rental data as are available and/or the potential earnings capacity of the property to estimate the gross income potential of the property" and must "base [such] projections . . . on reasonably clear and appropriate evidence." Applying these rules and a related federal regulation to the opinion given by wife's expert, the court found that wife's expert gave an opinion that satisfied any relevant legal inquiry.

¶ 20. The court adopted the opinion of wife's expert appraiser. As a result, the court increased the value of the Landrum property from $5.1 million to $7.2 million. This resulted in increasing the property award to wife for the Landrum property from $850,000 to $947,000. The property award increase caused a decrease in maintenance of $7,440 per year.

¶ 21. Next, the court evaluated husband's tax-treatment arguments. The entirety of the court's ruling on those questions reads as follows:

> The court rejects [husband's] request to reduce the valuation of certain assets to reflect potential capital gains taxes. The testimony to date is that he has no plan to sell any of the property which he has been awarded. The Vermont Supreme Court held in *Johnson v. Johnson*, 158 Vt. 160 (1992) that the tax status of property does not affect its valuation for divorce purposes except when the decree necessitates the sale. It would be highly speculative to reduce the market value of the assets in the marital estate to reflect after-tax net values.

¶ 22. The court's treatment of the education savings fund was equally brief. The court explained that it was satisfied that "these funds are the property of the beneficiaries . . . subject to the limitations imposed by the donor and the IRS concerning use of the money for educational purposes. These funds are not part of the marital estate." As a result of this change in the court's analysis, it struck the order distributing these funds.

¶ 23. Finally, the court recognized the right of husband to object to wife's attorney's fees. The court required each party to provide,

within fifteen days of the order, statements of the fees and expert witness costs to be taken from the marital estate. It gave the parties another fifteen days to object to the statements. After a hearing, in an order dated May 8, 2007, the court concluded that the fees requested by each side were reasonable and necessary, considering the complexity of the issues involved in the case, and that the hours logged by the attorneys on each side supported the fees. The court further concluded that payment from marital assets was appropriate since wife had been unable to pay the attorney's fees and costs at the time those costs were incurred.

¶ 24. The court's reconsideration decision did not end the skirmishing. Husband moved to amend the court's reconsideration decision pointing out that the court failed to apply a minority interest discount that was included in wife's expert's opinion. In a February 2007 order, the court denied the motion, concluding that a minority discount is never required in property valuation cases and would be inappropriate in this case.

¶ 25. In his motion to amend the reconsideration decision, husband again challenged the failure of the court to consider the tax consequences of its order. The court rejected this new request for reconsideration concluding that "[t]here is no evidence that any property is for sale or is likely to be sold" so that taxes would be owed. This appeal followed.

¶ 26. Husband makes three sets of arguments on appeal. The first category involves the court's reconsideration of the valuation of the Landrum interest. The second category speaks to other adjustments to the valuation of marital property, including (1) a minority discount to the valuation of the Landrum interest, and (2) a reduction in the cash property award to wife to reflect the taxes that husband will incur from the sale of property that husband states in necessary to generate cash to pay the award. The final category addresses attorney's fees. Wife, in turn, challenges the court's valuation of the Lane Press stock, the court's calculation of wife's maintenance award, and the designation of the education savings accounts as separate property. We consider husband's arguments first and in the order in which he presents them.

## I. Landrum Valuation

¶ 27. We begin with the reconsideration of the Landrum interest valuation. Husband contends that the court erred in revising, sua

sponte, its findings of fact and conclusions of law in responding to the parties' motions to amend under Vermont Rule of Civil Procedure 59(e). See V.R.F.P. 4(a)(1), 4(j)(1) (making Vermont Rules of Civil Procedure generally applicable in divorce proceedings, and V.R.C.P. 59 specifically applicable). Husband asserts that the court cannot amend a judgment sua sponte more than ten days after the entry of judgment unless there is a manifest error of law or fact. Husband argues that because no such error was present here, the court erred in amending the valuation of the Landrum interest.

¶ 28. "Rule 59(e) gives the court broad power to alter or amend a judgment on motion within ten days after entry thereof." Reporter's Notes, V.R.C.P. 59. Rule 59(e) codified the trial court's inherent power to open and correct, modify, or vacate its judgments. *West v. West*, 131 Vt. 621, 623, 312 A.2d 920, 921 (1973). A motion under Rule 59(e) suspends the finality of the judgment, and allows the trial court to revise its initial judgment if necessary "to relieve a party against the unjust operation of a record resulting from the mistake or inadvertence of the court and not the fault or neglect of a party." *Haven v. Ward Estate*, 118 Vt. 499, 502, 114 A.2d 413, 415 (1955).

¶ 29. Vermont Rule 59(e) is substantially identical to Federal Rule of Civil Procedure 59(e), and we have looked to federal decisions interpreting the federal rule for guidance in applying the Vermont rule. See *In re Robinson/Keir Partnership*, 154 Vt. 50, 54, 573 A.2d 1188, 1190 (1990). Husband argues that the court's power to amend a judgment sua sponte can be exercised only within ten days after entry of judgment and points to federal authority holding to that effect. See, e.g., *Burnam v. Amoco Container Co.*, 738 F.2d 1230, 1232 (11th Cir. 1984). We recognize this precedent, but find it inapplicable. The question before us is whether, when one or both parties files a timely motion to amend under Rule 59, the court may address a question not explicitly mentioned in either party's motion. Our case of *Robinson/Keir Partnership* broadly described the power as one to "reconsider issues previously before it, and generally [to] examine the correctness of the judgment itself," but did not address the precise issue before us. 154 Vt. at 54, 573 A.2d at 1190 (quotations omitted).

430

■ ¶ 30. The United States Courts of Appeal divide into two camps on this issue. The majority of the courts that have considered the issue recognize that once a Rule 59(e) motion is filed, the trial court has the power to make any appropriate modification or amendment, even with respect to issues not raised in the Rule 59(e) motion or motions. *United States v. Hollis*, 424 F.2d 188, 191 (4th Cir. 1970) (holding that although a party filed a Rule 59(e) motion only with respect to the amount of damages, the court could amend its decision with respect to the defendant's negligence as it "is not restricted to the modifications suggested by the parties" and because a "judge should not be forced to perpetuate a finding of fact . . . which he discovers to be erroneous"); see *EEOC v. United Ass'n of Journeymen & Apprentices*, 235 F.3d 244, 250 (6th Cir. 2000); *Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1313-14 (10th Cir. 2000); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 520 (7th Cir. 1993); *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1187 (5th Cir. 1984); see also *Henderson v. Koveleski*, 717 So. 2d 803, 806 (Ala. Civ. App. 1998) (citing federal cases and following majority view with regard to corresponding Alabama rule).

¶ 31. The Eleventh Circuit has reasoned to the contrary, and husband relies on a decision from that court, *Hidle v. Geneva County Board of Education*, 792 F.2d 1098 (11th Cir. 1986). In *Hidle*, the plaintiff moved to amend only the remedies portion of a favorable judgment in a suit alleging employment gender discrimination. The trial court denied this motion, set aside its earlier judgment for the plaintiff, and entered judgment for the defendant on the merits. On appeal, the Eleventh Circuit assumed that the lower court had the authority to change the judgment, but concluded that the lower court had abused its discretion in doing so, based on several factors. *Id.* at 1100. First, the court reasoned that a contrary holding would "inhibit[] the error-correcting function of . . . Rule 59(e)," because "a successful plaintiff given a less-than-complete remedy could not ask for correction without putting at risk the judgment in her favor." *Id.* The court also emphasized the length of time between the filing of the motion to amend and the court's decision, holding that "the interest of the parties and society in the finality of judgments, and the legitimate expectation of the parties concerning the judgment to the extent it is not questioned by the parties" stood against the lower court's course of action. *Id.*

¶ 32. We find the majority approach more persuasive generally, but also for a specific reason applicable to this case. This is not a case like *Hidle* where the party made a motion with respect to damages and the court reopened the liability judgment. Here, husband argued that the court made an error in valuing the Landrum interest, and the court reexamined that valuation. It found not only an error with respect to a mortgage, but also a greater error in the evaluation of the evidence. Husband cannot expect that a reopening of the Landrum valuation would be limited to correcting only the error he cited. Not surprisingly, wife responded to husband's Rule 59(e) motion on this point with arguments as to why considering the mortgage would require certain modifications in the valuation in favor of wife and a general reargument that the law the court relied on in support of husband's expert witness was wrong. Husband would foreclose any meaningful response to his motion because the response had to come after the close of the ten-day period specified in Rule 59(e). The interests of finality do not justify limiting the trial court's options to that extent.

¶ 33. Generally, we are convinced that giving the power to the court to alter or amend a judgment beyond the specific request of a party is an appropriate balance between reconsideration and finality. The limited exception to finality gives the court a last opportunity to ensure the completeness and accuracy of its decision in part "in order to avoid an appeal and its attendant delay." *Osborn v. Osborn*, 147 Vt. 432, 433, 519 A.2d 1161, 1163 (1986). We recognize that the presence of the court's power may inhibit a party from seeking a correction to an error for fear of reopening the underlying judgment. Nevertheless, these instances are very limited, and the party retains the remedy of appeal.

¶ 34. For the above reasons, we hold that the court did not exceed its authority under Rule 59 by considering the valuation of the Landrum interest generally although husband specifically raised only the failure of the court to consider a mortgage.

¶ 35. Husband next argues that even if the court could consider judgment amendments or revisions beyond those requested by the parties, it went beyond its power here because it did not correct an error, but instead reevaluated the credibility of a witness. Husband draws on our statement that a purpose of a Rule 59(e)

motion is for the court to amend the decree when there has been "mistake or inadvertence of the court." See *Rubin v. Sterling Enters., Inc.*, 164 Vt. 582, 588, 674 A.2d 782, 786 (1996). Drawing on federal law, he asserts that there are only four proper grounds for amendment of a judgment: (1) to account for "an intervening change in controlling law"; (2) to account for "newly discovered evidence"; (3) to "correct clear legal error"; and (4) to "prevent manifest injustice." 12 J. Moore, Moore's Federal Practice § 59.30[5][a][i], at 59-109 to 59-110 (3d ed. 2007). Because the court's original valuation of the Landrum property did not arise from "mistake or inadvertence of the court," or any of the above grounds recognized in federal cases, husband contends that the court could not amend the judgment.

■ ■ ¶ 36. We find husband's view of the court's power to be too narrow. Rule 59(e) "gives the court broad power to alter or amend a judgment." Reporter's Notes, V.R.C.P. 59. Thus, " 'the court may reconsider issues previously before it, and generally may examine the correctness of the judgment.' " *Robinson/Keir Partnership*, 154 Vt. at 54, 573 A.2d at 1190 (quoting *Ray E. Friedman & Co. v. Jenkins*, 824 F.2d 657, 660 (8th Cir. 1987)); see also *Bell v. Bell*, 162 Vt. 192, 195, 643 A.2d 846, 848 (1994) (stating that the purpose of a Rule 59(e) motion "is to examine the correctness of matters before the court at trial"). Whether we view the court's action here as the correction of a mistake or inadvertence, or an appropriate reconsideration of an important part of the judgment, we conclude that the court acted within its power. Thus, we conclude that the court made no procedural error in revaluing the Landrum interest.

¶ 37. This brings us to the merits of the court's valuation decision. Husband alleges that the court committed two specific errors of law and one error of fact. Husband's first legal argument addresses the issue of fair market value. Husband contends that, as a matter of law, the court must presume a sale or transfer of the property without the Lane Press lease for the purposes of calculating fair market value. Thus, husband argues that the court could not accept an expert witness's opinion that was based on the presence of the Lane Press lease.[2]

---

[2] For purposes of our analysis, we assume that husband can make this objection even though he did not object to the admission of the expert opinion.

¶ 38. We do not disagree that the concept of fair market value is based on the sale of the property being valued. Thus, for property taxation purposes, fair market value is

> the price which the property will bring in the market when offered for sale and purchased by another, taking into consideration all the elements of the availability of the property, its use both potential and prospective, any functional deficiencies, and all other elements such as age and condition which combine to give property a market value.

32 V.S.A. § 3481(1). The issue, then, is whether in considering such a sale, we must assume as a matter of law that the property has no tenant, even though its current use is as rental property.

¶ 39. The experts valued the property by the income capitalization method. As we noted in *Beach Properties, Inc. v. Town of Ferrisburg*, 161 Vt. 368, 372-73, 640 A.2d 50, 52 (1994), this method, while theoretically accurate, has serious difficulties in its implementation because small differences in the input factors can cause large differences in the valuation. Further, the income capitalization method must be based both on current income and on projections for future income. See *id.* at 374, 640 A.2d at 53; see also 32 V.S.A. § 3481(1) (valuation is based on "both potential and prospective" use).

¶ 40. Perhaps our most helpful precedent for this case is *Woolen Mill Assocs. v. City of Winooski*, 162 Vt. 461, 648 A.2d 860 (1994), in which the issue was the valuation for property taxation of a building containing residential and commercial rental units. In that case, one of the main disputed issues was the expected vacancy rate. The taxpayer's expert appraiser testified to the use of a particular vacancy rate derived from both the taxpayer's experience and the vacancy rate of a similar property. The State Board of Appraisers accepted the taxpayer's evidence, and this Court affirmed that decision as within the Board's discretion, noting the obligation to base valuation both on current experience and projections. *Id.* at 465, 686 A.2d at 863. For the same reason, we affirm here. The experts and the court were basing their valuation on "prospective" use of the Landrum property, a factor specifically authorized in the statutory definition of fair market

value.[3] To refuse to consider the presence of the Lane Press lease would be to ignore the effect of prospective use on valuation.

■■■ ¶ 41. In a related argument, husband challenges the consideration of the Lane Press lease because the lease is between related entities and was not negotiated at arm's length. Again, we reject the argument. Husband argues that two property tax cases hold that sales of properties through transactions that were not at arm's length do not, as a matter of law, establish the value of the property that was sold. See *Great Bay Hydro Corp. v. Town of Derby*, 2007 VT 10, ¶ 8, 181 Vt. 574, 917 A.2d 486 (mem.); *Beach Properties*, 161 Vt. at 375-76, 640 A.2d at 54. In this case, we are not valuing the lease, and thus, these precedents do not apply. Whether or not the lease was negotiated at arm's length, it represents the source of income for the property owners now and for some period in the future. The court properly considered it in valuing the property by the income capitalization method.

¶ 42. Husband's final argument in this category attacks the evidentiary basis of the court's valuation of the Landrum property. We will uphold a trial court's valuation when it is "supported by adequate findings, which are in turn supported by sufficient evidence in the record." *Kanaan v. Kanaan*, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995). Husband asserts that the following rulings were not supported by the evidence: (1) the court's decision that the Lane Press lease rate was within market range; and (2) the court's determination that the lease ran for seven years. We look at these arguments in order.

¶ 43. Husband first argues that the evidence does not support the court's conclusion that the lease rate was within market range. Specifically, husband argues that both experts testified that the lease rate was above the market rate. Based on the record, husband argues, there was no evidence to support the court's characterization of the lease.

■■■ ¶ 44. We disagree. Although wife's expert did, at one point, state that the Lane Press lease rent was "certainly above" the market rate, the court based its decision to use the lease terms

---

[3] We recognize that 32 V.S.A. § 3481(1) specifically applies only for purposes of valuation to determine property taxes, and, for that reason, contains detailed provisions not applicable here. We draw on it for its helpful general definition of fair market value.

to value the Landrum property on several pieces of evidence in the record. The court found that the current rate under the lease was $6.39 per square foot and acknowledged that both experts testified to market rates below that amount — that is, ranges of between $4.50 and $5.75 per square foot and between $4.50 and $6.00 per square foot. The court's decision nonetheless to rely on the lease is based on record evidence that the lease was fair to both parties involved. The court stressed husband's testimony that he had not participated in the negotiation of the lease. Husband also testified that he had asked Chittenden Bank, the trustee of the ESOP plan, to review the terms of the lease. Furthermore, in spite of its findings concerning the reliability of the lease, the court considered relevant standards of appraisal practice, including the Uniform Standards of Professional Appraisal Practice and relevant commentary by the FDIC and other federal regulatory actors. The court reasonably read these authorities to permit appraisals based on similar leases "so long as [the] source of the rent is clearly identified." We conclude that the court's finding was not clearly erroneous.

¶ 45. Again, we note that husband's argument on this claim is largely beside the point. Whether the lease is above market rate is not determinative of its use in valuating the Landrum interest, unless the rate somehow undermined the finding that Lane Press would remain a tenant. We turn to that question because husband has challenged the court's finding that Lane Press would remain a tenant in the building for another seven years.

¶ 46. In making this finding, the court relied on the testimony of wife's expert appraiser, who assumed Lane Press would remain as a tenant for the next seven years. The lease expired in less than two years, but Lane Press had an option to renew for the remainder of the seven years.

¶ 47. Even in its initial decision, however, the court found that it was unlikely that Lane Press would move "within the foreseeable future." The building is one of the largest commercial buildings in the county and was modified three times to meet the unique needs of Lane Press. The cost for Lane Press to move to a new building would be substantial and would require a substantial amount of time. No witness testified that a move was likely for any reason. The court acknowledged in its reconsideration decision that Lane Press "could fail, move overseas, or find a

better location in Chittenden County and somehow break the lease," but also observed that "there is no evidence that any of these scenarios are likely to occur." We conclude that the court's finding that Lane Press would remain a tenant for seven years was supported by the evidence.

## II. Adjustments to Valuation

¶ 48. Husband's first argument in this category concerns the necessity of applying a minority discount to the valuation of husband's interest in the Landrum partnership. A minority discount reflects the conclusion that a party's ownership interest in an economic entity is worth less when the party does not exercise control over the entity.

¶ 49. In his second reconsideration motion, husband requested that the court reduce the value of his interest in the Landrum partnership because he owned only a one-third interest in that partnership. The court rejected husband's proposed minority discount, reasoning that a discount would be inappropriate because "[t]here is no evidence that the sale of [husband's] one-third interest in Landrum is in any way possible." The court emphasized that husband "is the person primarily in control of the only tenant" and that "the tenant . . . is making money and providing him with a substantial income."

¶ 50. Husband relies on two cases in arguing that a minority discount was required in this case. In *Kasser v. Kasser*, 2006 VT 2, 179 Vt. 259, 895 A.2d 134, the wife appealed the family court's decision to apply a minority discount to the valuation of shares of the husband's stock in a closely held company. We concluded that the court's application of a discount was "within the range of evidence presented at trial." 2006 VT 2, ¶ 27. We found significant the "difficulty inherent in establishing the value of closely held stock" and concluded that, in the face of conflicting evidence, the court's application was within its discretion. *Id.* ¶ 28.

¶ 51. The second case, *Goodrich v. Goodrich*, 158 Vt. 587, 613 A.2d 203 (1992), involved stock in which the wife held only a small minority interest in a family corporation. The trial court applied a minority discount, which we found to be within the range of its discretion. *Id.* at 592, 613 A.2d at 206. We based our assessment on several factors, including the facts that: (1) the wife held only a small percentage of outstanding stock; (2) she was unable to affect the management of the company; and (3) her interests were

not readily marketable and could not convey a controlling interest in the corporation. *Id.* at 591-92, 613 A.2d at 205-06.

¶ 52. Neither of these decisions requires the use of a minority discount in this case; in both, the trial court accepted expert testimony supporting a minority discount, and we affirmed under the abuse-of-discretion standard of review. The family court in this case exercised its discretion and gave a credible reason why it refused a minority discount. The primary purpose of the Landrum partnership was to provide income to the three brothers, and the valuation of the partnership was based on the capitalization of that income. While husband did not have a controlling interest in the Landrum partnership, he was certainly the most important of the three equal partners because he had effective control of the corporate tenant from which the income was derived. There was no evidence that any interest would be disposed of or that the partnership would cease to be the way the family derived income from Lane Press. Reducing the value of the partnership interest, while husband received full income from the partnership based on full valuation, would be unfair to wife. See *Brown v. Brown*, 792 A.2d 463, 476-77 (N.J. Super. Ct. App. Div. 2002) (reasoning that minority discount can be applied only in exceptional circumstances; it would be inequitable for one spouse to keep the minority property interest, with the value discounted, while minimizing the property distribution to the other spouse). We conclude that the decision to disallow the minority discount in this case was within the family court's discretion.

¶ 53. Next, husband argues that the court erred because it failed to adjust the value of virtually all of the property by the tax liabilities that would accrue when the properties were sold to comply with the property distribution. Alternatively, husband sought that his payment of taxes be considered in determining the amount of the property distribution to wife. For most of the major items of marital property, husband was awarded the property but was required to pay wife her half of the value in cash. He argues that he would have to sell much of the property to comply with the decree and would have to pay taxes on the sale. Thus, he argues that wife should have to pay half of the taxes necessitated by the sale. The court reasoned that such consideration was inappropriate because: "[t]here is no evidence that any property is for sale or is likely to be sold" and that consequently the court had "no basis on which to reduce the value

of the property by the amount of taxes which may never be incurred."

¶ 54. We have clearly stated that "the tax status of assets in the hands of one of the parties should not affect their fair market valuation, unless the decree necessitates their sale." *Johnson v. Johnson*, 158 Vt. 160, 165, 605 A.2d 857, 860 (1992). The record before us does not demonstrate that husband will have to sell any property to comply with the property division mandated in the divorce decree. Any other consideration of potential taxation would be purely speculative, and "[i]ncluding vague and theoretical transactional tax consequences as routine factors in determining fair market value would add unnecessary complexity to an evidentiary problem that is already difficult, especially where the assets to be valued are closely held business interests." *Id.*

¶ 55. Husband argues that *Johnson* and later cases established an alternative method of considering tax liability and that the court erroneously failed to consider it. In *Johnson*, we quoted from a decision in which the Maryland Court of Special Appeals reasoned that potential income taxes " 'may be another factor to consider in establishing the amount and method of payment of any monetary award.' " *Id.* (quoting *Rosenberg v. Rosenberg*, 497 A.2d 485, 503 (Md. Ct. Spec. App. 1985)). We affirmed an award in *Cabot v. Cabot* where the court considered potential income taxes in fashioning its property award. 166 Vt. 485, 496-97, 697 A.2d 644, 652 (1997). We noted there that such treatment was particularly appropriate where one spouse retains the marital property and pays off the other spouse's share in cash. *Id.* at 496, 697 A.2d at 651. Similarly, in *Hayden v. Hayden* we affirmed an award that considered the cost of a real estate sales commission, while reiterating the holding of *Johnson* that potential tax or commission costs cannot affect the value of the marital assets. 2003 VT 97, ¶ 16, 176 Vt. 52, 838 A.2d 59.

¶ 56. Although husband argued for flexibility in the property award, his specific request was that the tax liability for the sale of each asset be computed and wife's award be reduced to reflect that amount. Thus, the relief he requested was indistinguishable from revaluing the assets. While he has suggested generally that one or more of the assets would have to be sold, he was unspecific in that assertion. It would be inappropriate to

consider the tax liability on a sale of assets if no asset is to be sold and husband is to accrue no tax liability. Thus, the family court must have discretion in considering potential tax liability. While husband argues that the court failed to exercise its discretion, we read the court's decision differently — that is, that the court was unconvinced that there would be any tax liability and declined to change the property award for this purpose. We find no error in the court's ruling.

### III. Attorney's Fees

¶ 57. Finally, with respect to husband's appeal, we address the issue of attorney's fees. The family court observed: "[t]his is a divorce in which [husband] started out with a comprehensive understanding of the family finances, including The Lane Press, and [wife] started out with far less understanding. The issues were reasonably complex. Both law firms spent many hours preparing for a four-day trial." Following this and other observations, the court ordered that the parties' attorney's fees and expenses be paid out of "jointly held marital assets without discount or adjustment based upon the amount of each side's bills." This decision was based in part on the court's conclusion that wife lacked the means to pay the fees and expenses at the time they were incurred. The decision was also made, however, in an attempt "to divide the parties' income and assets as evenly as possible between the two spouses." The court found that if wife was compelled to pay her attorney's and witnesses' fees out of her share of the property and income, "she [would] fall about $100,000 behind [husband] in the final property division," which would be contrary to the court's purpose in dividing the income and assets equally. The court also observed that "[t]here is no evidence that either side padded their bills or spent time in a wasteful manner."

¶ 58. On appeal, husband claims that it was error for the family court to order attorney's fees and costs to be paid out of jointly held marital assets without discount or adjustment. Husband argues that the court had a duty to evaluate the "ongoing financial needs of the party receiving the award, not his or her ability to pay the fees during the divorce proceeding." Thus, husband asserts that "the court misapplied the legal standard by focusing only on [wife's] asserted inability to pay the fees prior to judgment." The correct standard, argues husband, would be to look to the post-judgment finances of the parties, which would

reveal that wife received $3.26 million in cash, plus almost $250,000 per year in maintenance, while husband received the majority of his share of the divorce award in the form of noncash assets.

¶ 59. The primary considerations in awarding attorney's fees are the financial need of the party receiving the award and the ability of the other party to pay. *Begins v. Begins*, 168 Vt. 298, 305, 721 A.2d 469, 474 (1998). As we explained most recently in *Willey v. Willey*, "the question is not simply whether the requesting party has the bare ability to pay. Rather, the inquiry is an equitable one, and the family court has discretion to award attorney's fees even to a party who has received an award in the underlying action sufficient to pay the fees." 2006 VT 106, ¶ 26, 180 Vt. 421, 912 A.2d 441 (citation omitted).

¶ 60. The family court was motivated by a number of factors. Although wife had incurred greater witness and attorney's fees, the difference was explained by the fact that wife was unaware of the details of husband's financial circumstances. Furthermore, the court's overarching goal in its financial order was to attempt to divide the parties' income and assets as evenly as possible. Requiring wife to pay her own attorney's fees and expenses out of her share of the property award would, in the eyes of the family court, frustrate this goal.

¶ 61. We find that the family court's consideration of the issue of attorney's fees was appropriately focused on achieving equity and justice among the parties. The court discussed when to measure wife's need for assistance in paying the fees, and concluded, consistent with our precedents, that her prejudgment need was not negated by a property or maintenance award from which fees could be paid. The family court's decision to award attorney's fees is discretionary, see *Willey*, 2006 VT 106, ¶ 27, and we find no evidence of abuse of discretion here.

### IV. Cross-Appeal

¶ 62. We turn now to wife's arguments on cross-appeal. Wife first argues that the court's $221,000 annual maintenance award ($18,400 per month) fails to meet the family court's stated goal of equalizing the parties' respective incomes and living standards. Before setting forth the specifics of her argument, we examine the family court's maintenance award. The court arrived at its main-

tenance award by dividing in half its best estimate of the parties' average annual disposable income during the previous few years. From its rough estimate of $600,000 in post-tax annual income, the court subtracted income that had been reinvested in the businesses. Dividing the resulting number in half, the court concluded that wife should be awarded approximately $250,000 per year in disposable income, the equivalent of a little over $400,000 per year in gross income. Reducing that figure by thirteen percent to account for the fact that wife would have no mortgage payments as the result of the $1.4 million she received in home equity, the court aimed at ensuring that wife would have about $383,000 in annual gross income. The court imputed $45,000 in annual employment income to wife and estimated that wife would receive an additional $117,000 in annual income based on a conservative rate of return on her cash award, after its reduction for a purchase of a home. To reach the goal of wife having $383,000 in yearly gross income, the court awarded wife $221,000 in annual maintenance ($45,000 + $117,000 + $221,000 = $383,000).

¶ 63. Wife filed a motion for reconsideration in which she challenged various aspects of the court's property division, but not any aspect of the maintenance award. In her cross-appeal, she devotes two and one-half pages to her argument that the maintenance award fails to accomplish what the trial court was attempting to do. Wife argues that: (1) the thirteen-percent downward adjustment of her share of the parties' annual disposable income effectively adjusted husband's share upward so that he could continue to live in the luxurious marital home; (2) the court failed to factor in the tax consequences of husband paying wife $221,000 in maintenance; (3) husband has the ability to pay himself more income from Lane Press; (4) the court failed to account for income that husband reinvested in the Landrum partnership; and (5) the court should have accounted for the fact that wife continued to live in the marital home for part of the first year and was responsible for expenses associated with the home during that period.

¶ 64. We conclude that wife has failed to show that the family court abused its broad discretion in arriving at its maintenance award. See *Golden v. Cooper-Ellis*, 2007 VT 15, ¶ 47, 181 Vt. 359, 924 A.2d 19 ("The family court has considerable discretion in ruling on maintenance, and the party seeking to overturn a maintenance award must show there is no reasonable basis to

support the award to succeed on appeal."). We cannot conclude that the court abused its discretion because, for the most part, wife failed to direct the court to the maintenance issues she now raises for the first time in her cross-appeal. Cf. *Bell*, 162 Vt. at 201, 643 A.2d at 852 (refusing to consider the wife's argument concerning payment of taxes on liquidation of a marital asset, given that the wife failed to raise the issue in her requested findings, her motion to amend, or otherwise at trial).

¶ 65. Wife certainly had a vehicle to raise those issues below — she filed a motion for reconsideration in which she challenged specific aspects of the property award, but did not challenge any aspect of the court's maintenance award. She did not raise concerns as to the tax consequences of the court's award, for example, which she now claims skewed the result sought by the court. Wife may be correct as to the federal tax treatment of maintenance, but she asks us to consider it as a single factor in each party's return, producing a disposable income that has not been found, as a matter of fact, by the trial court. Without specific findings addressing the tax consequences of maintenance in the context of these parties' finances, we cannot speculate that their disposable income is something other than what the trial court found it to be. Although wife is not required, as a matter of appellate procedure, to challenge a specific aspect of a maintenance award before assigning it error on appeal, the practical consequences of her not doing so in these circumstances is that she has failed to meet the rigorous standard of review by demonstrating that the trial court abused its discretion in not considering the particular tax consequence she now complains of on appeal.

¶ 66. Wife's next argument is that the court's valuation of the Lane Press stock was clearly erroneous. The decision of the family court on this issue is set out at ¶¶ 3-7, *supra*. Again, we operate under a limited standard of review. We review the family court's valuation of marital property for abuse of discretion, and the court's discretion in this respect is "broad." *Kanaan*, 163 Vt. at 410, 659 A.2d at 134.

¶ 67. The court was faced with two expert valuations of husband's interest in Lane Press. The court found both appraisers to be "highly qualified and experienced professionals." It chose to rely on husband's expert because of his lengthy involvement with Lane Press and "his focus on income capitalization," the valuation

method the court favored. Thus, the court adopted the valuation testified to by husband's expert.

¶ 68. Wife repeats to this Court the arguments she made to the family court as to why it should reject the opinion of husband's expert and adopt that of her expert. These arguments were properly made to the trial court, but are out of place here. The trial court had the discretion to accept the expert's opinion as it did. The trial court did not abuse its discretion in doing so.

¶ 69. Wife's final argument is that the court erred in not characterizing the education savings accounts as marital assets subject to equitable division. As we discuss below, the evidence with respect to these accounts is sparse. In its original decision, the court stated:

> The Drumhellers have set aside $76,703 in college funds for their daughters. These funds will remain in a joint account for use in paying tuition and other educational expenses for the three daughters.

Although the court dealt with all of the other property in its conclusions of law and judgment order, it did not deal directly with these funds. Nevertheless, we understand that its intent was to leave these funds where the court understood them to be, for the benefit of the daughters.

¶ 70. In his motion to amend, husband stated that the funds had never been in a joint account, were originally given by husband's parents and had been transferred into § 529 trust accounts with husband as sole trustee. He alleged that they were not marital assets. Wife responded that the funds were given to both her and husband for the children, and proposed that she and husband "agree to use it toward the girls' college tuition and related expenses." The court reversed its initial decision and, citing the fact that the funds came from husband's father, decided that "these funds are the property of the beneficiaries" and "are not part of the marital estate." The court likened them to Vermont Uniform Gifts to Minors Act (VUGMA) funds, which we held were property of the beneficiaries and not marital property in *Wade v. Wade*, 2005 VT 72, ¶ 10, 178 Vt. 189, 878 A.2d 303.

¶ 71. On appeal, wife argues that the funds were set up to comply with § 529 of the Internal Revenue Code, 26 U.S.C. § 529, and are not similar to VUGMA accounts because they are

revocable. See generally K. Ryan, *Access Assured: Restoring Progressivity in the Tax and Spending Programs for Higher Education*, 38 Seton Hall L. Rev. 1, 24-29 (2008) (describing how § 529 plans work). In addressing this argument, we point out that we have a very broad definition of marital property, which includes "[a]ll property owned by either or both of the parties, however and whenever acquired." 15 V.S.A. § 751(a). The statute further provides that "[t]itle to the property, whether in the names of the husband, the wife, both parties, or a nominee, shall be immaterial, except where equitable distribution can be made without disturbing separate property." *Id.*

¶ 72. Two decisions of this Court are central to the issue before us. In *Lynch v. Lynch*, we addressed whether property in a trust was marital property, where one spouse was the grantor and has expressly reserved a power of revocation. 147 Vt. 574, 576, 522 A.2d 234, 235 (1987) (per curiam). Our holding was that "the power of revocation is tantamount to ownership of the trust property and of such a nature that it is subject to order of the court." *Id.* at 577, 522 A.2d at 235. We indicated that it would be inconsistent with § 751 for a spouse "to harbor marital assets while maintaining control through a power of revocation." *Id.*

¶ 73. The second is *Wade v. Wade*, the decision cited by the family court, in which we held that a gift made pursuant to VUGMA is not part of the marital estate. 2005 VT 72, ¶ 10. Our rationale was that the "gift is irrevocable, and the child possesses an indefeasible interest in the property held in the VUGMA account." *Id.* We concluded that "the funds in a VUGMA are the child's property, [and] are not part of the marital estate subject to equitable distribution in a divorce proceeding." *Id.*

¶ 74. In essence, wife argues that *Lynch* governs and husband argues that *Wade* governs. In arguing that the trusts in which the education savings funds are placed are revocable and owned by husband, wife points to federal tax law and the resolution of the comparable issue in the bankruptcy context in *In re Addison*, 368 B.R. 791 (B.A.P. 8th Cir. 2007), *affirmed in relevant part*, 540 F.3d 805 (8th Cir. 2008). In *Addison*, the debtor argued that § 529 accounts were the property of the beneficiary child and therefore not part of the bankruptcy estate, citing 26 U.S.C. § 529(c), a provision of the Internal Revenue Code. The court found the tax law irrelevant to the issue before it: "§ 529 merely gives favorable tax treatment to such accounts; it does not determine who is the

owner of the account for any other purpose." *Addison*, 368 B.R. at 795. It held, however, that "§ 529 funds can be re-vested in the settlor of the account, albeit with a tax penalty" and that "for all purposes other than tax treatment, the creation of a § 529 account is not a completed transfer to the beneficiary, and the settlor remains the owner of the funds." *Id.*

¶ 75. As the *Addison* court noted, the exact nature of § 529 accounts is not regulated by federal law, except for the tax consequences. *Id.* In fact, § 529 plans may be "established and maintained by a State or agency or instrumentality thereof." 26 U.S.C. § 529(b)(1)(A)(ii). The *Addison* court's conclusion as to the ownership of the funds was apparently based on a Minnesota law that governed such funds. 368 B.R. at 795. Vermont has a similar statutory scheme — the Vermont Higher Education Investment Plan, 16 V.S.A. §§ 2875-2879f — and it provides that a participant may "cancel a participation agreement at will, and any return of funds from the participant's account shall be subject to terms and conditions established by the corporation." *Id.* § 2879a(a). In this case, husband appears to be the participant. See *id.* § 2876(8) (defining participant as "a person who has entered into a partici-pation agreement pursuant to this subchapter for the advance payment of postsecondary education costs on behalf of a benefi-ciary").

¶ 76. The court's decision in this case is based on virtually no record,[4] and the parties have made assertions that may be true, but have no support in the evidence. Neither party has offered the actual terms of the trusts in this case. Moreover, the fact that the money came originally from husband's father, a fact of significance to the court, is irrelevant to whether it is marital

---

[4] The parties have cited to no testimony or exhibits that explain the nature of the education savings funds. The only evidence that we can find that references these funds is an exhibit that lists in spreadsheet form all property, the value of the listed property, and a proposed distribution. It lists this asset as "College Bound funds for girls," values it at $76,703, per 3/8/06 statements, and does not show it distributed to either party. The exhibit was admitted in connection with the testimony of a CPA who testified that he knew the amount of the funds, but no other specifics about them. Husband's counsel represented that the funds came from husband's father, but there was no testimony to that effect that we can locate.

We note particularly that even the fact that the education savings funds are § 529 funds, the basis for the arguments about whether they are marital property, is found only in husband's memorandum of law with no evidentiary support.

property under 15 V.S.A. § 751 (establishing jurisdiction over all property of either or both of the parties "however and whenever acquired"). Although 16 V.S.A. § 2879a might tempt us to hold that the funds are revocable or otherwise reachable by husband, albeit with a tax penalty, see 26 U.S.C. §§ 529(c)(6), 530(d)(4) (establishing tax penalty for distributions not used for educational expenses), our information is incomplete because it appears that the participant agreement could bind husband to the restrictions of VUGMA. See Plan Disclosure Booklet for Vermont Higher Education Investment Plan 6-7 (2005), http://www.vheip.org/pdf/vt_discl.pdf (allowing custodian under Uniform Gifts to Minors Act to open account, noting that funds may be withdrawn for purposes other than qualified educational expenses only in accordance with the Uniform Gifts to Minors Act); cf. J. Field, *The Many Benefits of Section 529 Plans for Education Expenses*, 30-AUG L.A. Law. 15 (2007) (in California, the participant can be a custodian under California Uniform Transfers to Minors Act). In short, we cannot determine whether *Lynch* or *Wade* controls on this record.

¶ 77. Husband blames the lack of an evidentiary record on wife. In fact, the court's ultimate decision that the education savings funds were not marital property was based on husband's Rule 59(e) motion which contained various factual assertions with no evidentiary support. In responding to the motion, however, wife conceded that the original understanding of the court — that the funds were in accounts held by husband and wife as joint trustees — was erroneous, leaving the original order of the court, to the extent we can determine it, without evidentiary support. Under the circumstances, our only available course of action is to vacate the decision that the education savings funds are not marital property and remand for further evidentiary development of this issue and a new order with respect to these funds.

¶ 78. We do not believe, however, that we should reopen the other aspects of the property disposition or the maintenance award because of the error with respect to the § 529 funds, even if the ultimate decision is that they are marital property. The only other issues appealed concerning the property disposition involved challenges to the valuation of key assets, and we have affirmed the family court's decisions on these issues. The family court provided its rationale for the allocation of assets to achieve roughly equal distribution, and neither party has appealed the allocation. The family court saw no maintenance ramifications from

its decision on whether the § 529 funds are marital property, and the parties have not claimed that there are or should be any ramifications. Therefore, we reverse and remand solely with respect to the § 529 accounts and otherwise affirm all aspects of the family court's orders that were challenged on appeal.

*The family court order that determined that the education savings funds were not marital property is reversed and remanded for further proceedings consistent with this opinion; in all other respects, the judgments are affirmed.*