NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 105

No. 2017-269

In re B.K. and L.K., Juveniles

Supreme Court

On Appeal from
Superior Court, Caledonia Unit,
Family Division

October Term, 2017

Robert R. Bent, J.

Michael Rose, St. Albans, for Appellant Father.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Martha E. Csala,
  Assistant Attorney General, Waterbury, for Appellee.

PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Morris, Supr. J. (Ret.),
        Specially Assigned

¶ 1.    **CARROLL, J.**   Father appeals the termination of his parental rights to B.K., age 9, and L.K., age 11. We reverse and remand for further proceedings.

¶ 2.    This case began in July 2014 when the Department for Children and Families (DCF) filed a petition alleging that B.K. and L.K., who were then six and seven years old respectively, were children in need of care or supervision (CHINS). In September 2014, the parents stipulated to a CHINS adjudication, which was adopted by the family court. In the stipulation, the parents admitted that over the previous four years they had not engaged in recommended services for domestic violence and substance abuse, and that the children had suffered severe trauma due to witnessing violence in the home and had frequent unexcused

absences and tardiness from school during the 2013-14 school year. The court approved a case plan with concurrent goals of reunification with mother and father or adoption, with interim custody with DCF. The case plan called for father to participate in parenting classes and domestic violence treatment, and for mother to participate in substance abuse and mental health treatment.

¶ 3. Father made significant progress toward the case plan goals. He attended and completed a batterers intervention program, participated in other parenting classes, and successfully completed Family Time Coaching. His substance abuse assessment was negative, but he continued to engage in therapy. He had regular unsupervised visits with B.K. and L.K. He initially struggled to find housing, but eventually secured adequate housing and steady employment. Mother, by contrast, attended visits and therapy inconsistently. She was incarcerated for a period in 2015. Since December 2015, mother has had no contact with the children.

¶ 4. Both L.K. and B.K. had significant behavioral issues. A January 2015 trauma evaluation report identified early exposure to trauma, parental substance abuse and domestic violence, and chaotic living conditions as some of the sources of their problems. At that time, L.K. displayed trauma symptoms including anxiety, hypervigilance, anger, aggression, and defiance. Even after living in foster care for months, L.K. continued to exhibit troubling behavior, such as smearing feces all over the walls, eating feces, and masturbating excessively and in public. She sometimes wet herself prior to and during visits with father. She continued to demonstrate anger, defiance, and aggression, and was fixated on sex and men. B.K.'s behavioral issues were less extreme, but she was also defiant and oppositional. The children were extremely aggressive towards each other. Their fighting frequently escalated prior to visits with their father, although this pattern had improved somewhat over time.

¶ 5. The children's therapists agreed that they needed consistent, structured care to address their needs. L.K.'s therapist believed that extensive contact with father would undermine these goals. A psychologist who evaluated father in October 2016 agreed that father was unable

to meet the children's needs on a full-time basis, and that the best long-term placement for the children was their foster home. However, she found that father played a constructive role in their lives and recommended that they continue to have monthly contact with him. The psychologist opined that the children had already suffered a loss in not having contact with their mother and that, if they were unable to continue to see their father, it would be devastating to them. She recommended that the children and father have contact at least once per month.

¶ 6. In April 2016, DCF filed petitions to terminate the parental rights of both parents. The court held a three-day hearing in November and December 2016. In March 2017, the family court issued a written decision in which it granted termination of mother's rights but denied the petition as to father.[1] The court stated that father had made progress, but it did not believe that father would ever be able to "effectively parent these high needs children." It determined that father would not be able to resume parental duties within a reasonable time, given the children's need for permanency and consistency. However, the court found that father played a constructive role in the children's lives and that it would not be in their best interests to lose father as they had mother. It noted that while the foster father was friendly toward father, the foster mother was "not welcoming" to father and had expressed reluctance to allow visitation with him more than four times a year if the girls were adopted. In the absence of a post-adoption contract,[2] which would require the foster parents' consent, the court could not guarantee that father would continue to have the monthly parent-child contact recommended by the psychologist who evaluated father. The court acknowledged that the most important factor in the best-interests analysis was whether father could resume parental responsibilities within a reasonable time. However, it found that in this

---

[1] Mother did not appeal the termination of her parental rights.

[2] Postadoption contact agreement. See 33 V.S.A. § 5124.

case, father's loving parental bond with the children outweighed the other factors. The court therefore concluded that termination of father's rights was not in the best interests of the children.

¶ 7.    DCF timely filed a motion to alter or amend the decision pursuant to V.R.C.P. 59(e), arguing that the court improperly weighed the evidence. The court held a hearing on the motion on June 8, 2017. At the beginning of the hearing, the court stated that it would give the parties an opportunity to present evidence. DCF's attorney responded that there was no evidence to present and that "this is purely a legal argument." He argued that the court's denial of the termination petition denied the children permanency. The children's attorney likewise stated that permanency was her primary concern and that she had "heard a rumor" that the children would not be able to remain in their current placement if adoption were not possible. After hearing from father's attorney, who opposed DCF's motion, the court expressed concern that it had not heard from the foster parents. It questioned why the children could not be placed into a permanent guardianship. DCF's attorney stated that the foster parents would lose important subsidies and Medicaid if they could not adopt.

¶ 8.    The court then asked to hear from the foster mother. She stated that the children had recently expressed a desire to be adopted and to be part of their family. She said that B.K. called the foster parents "mom" and "dad," and L.K. was starting to do so as well. She said that she had no intention of cutting father out of the children's life. She indicated that a permanent guardianship would be an unsatisfactory solution because father could legally seek increased visitation, which they would likely have to hire a lawyer to oppose, and they were living on limited income. The court then stated, "I'm going to just stop—just so you understand. I am treating [foster mother's] statements as continuation of her testimony, in case anybody needs to examine her further, and she remains under oath—everybody remains under oath once they've given testimony."

¶ 9.    The following exchange then took place:

4

The court: I wasn't presented with an awful lot today in terms of factual evidence.

[DCF's attorney]: But, Judge, it's a legal argument.

The court: You say it is, I get—I get—

[DCF's attorney]: If the Court wanted to reopen the evidence, then it should have told us that that's what it was. My understanding of procedure with this motion is that you go back to the record, you go back to the—to your decision that was made—

The court: But you rejected—I rejected—well, the way I see it is I rejected your plan.

[DCF's attorney]: But in doing so, you foreclosed the option of adoption.

The court: At the moment, yeah.

[DCF's attorney]: Which is, according to the Legislature, the second most preferred permanency option.

The court: They're—they're just hierarchical, and if I have a basis for doing something different, I can. But I have to make sure, at the end of the day, that I figured out what it's going to look like for these kids on the street. So that's what I'm trying to do, and that's why I say I've been presented with little today other than the legalisms, and I was looking for more. All right. That's it. I'll make the decision.

¶ 10. On June 28, 2017, the court issued a written decision granting DCF's motion and terminating father's parental rights. The court noted that it saw permanent guardianship as the best solution for the children, but this would require agreement by the potential guardians, "which was not forthcoming." The court stated that it "perceived the long-term stability of the placement to be in some jeopardy without a permanent and acceptable solution for the foster family." It also stated, "[t]he other fact which the court learned at the hearing is that the children are expressing a desire to be a family with [foster parents] with whatever that entails. The court finds that evidence helps with seeing the need for permanency more clearly." The court concluded that permanency should have been given greater weight in its analysis and that the best interests of the children were served by termination.

5

¶ 11.     On appeal, father argues that the court's decision lacked a rational basis and that it erred by terminating his parental rights based on findings that were not supported by clear and convincing evidence.  He argues that the court based its decision on new facts provided at the June 2017 hearing and that such evidence is properly the subject of a motion to modify under 33 V.S.A. § 5113(b) rather than a Rule 59(e) motion.  We agree that the court erred by reopening the record on its own initiative in response to DCF's Rule 59(e) motion, and that this error warrants reversal of the court's decision.

¶ 12.     The Rules of Civil Procedure, including Rule 59, apply to CHINS proceedings in family court.  V.R.F.P. 2(a).  DCF expressly stated in its motion that it sought to alter or amend the court's March 2017 decision pursuant to section (e) of Rule 59, which gives the court broad authority to amend, alter, or vacate a judgment if a party so moves within ten days of entry of judgment.  Reporter's Notes, V.R.C.P. 59.  We have explained that "the goal of Rule 59(e) is to 'make clear that the [trial] court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment.'"  In re SP Land Co., LLC, 2011 VT 104, ¶ 19, 190 Vt. 418, 35 A.3d 1007 (quoting N. Sec. Ins. Co. v. Mitec Elecs., Ltd., 2008 VT 96, ¶ 41, 184 Vt. 303, 965 A.2d 447).  "Under Rule 59(e), the court may reconsider issues previously before it, and generally may examine the correctness of the judgment itself."  In re Robinson/Keir P'ship, 154 Vt. 50, 54, 573 A.2d 1188, 1190 (1990) (quotation omitted).

¶ 13.     While the trial court has broad power under Rule 59(e) to reconsider issues previously presented, the rule does not contemplate reopening the evidence or creating a new record.  DCF's motion did not seek to reopen the judgment based on newly discovered evidence.  See 11 C. Wright & A. Miller, Federal Practice and Procedure, Civil § 2810.1 (3d ed.) (explaining one of "four basic grounds" for granting Rule 59(e) motion is when moving party asks to present newly discovered or previously unavailable evidence).  Indeed, DCF's attorney expressly stated that no new evidence was necessary for the court to resolve its motion.  Rather, DCF asked the

6

trial court to take a second look at its findings from the termination hearing and its application of the law to those findings to determine if it weighed the factors appropriately. Under these circumstances, it was error for the trial court to reopen the record sua sponte.

¶ 14. Contrary to DCF's argument, our decision in Drumheller v. Drumheller does not support the proposition that the trial court had the power to take new evidence at the Rule 59(e) motion hearing in this case. 2009 VT 23, 185 Vt. 417, 972 A.2d 176. In Drumheller, the husband moved to amend portions of the family court's final divorce decree regarding the valuation of certain property. The court granted the motion and reviewed the valuation, and in so doing discovered that it had made an error. It therefore amended the judgment by making additional findings of fact and revaluing the property based on the evidence that had been presented at trial. On appeal, the husband argued that the court erred by revising its findings of fact and conclusions of law where neither party requested it to do so. We affirmed, ruling that the court acted within its authority by correcting its own mistake and revaluing the property. Id. ¶ 32. We rejected the husband's argument that the trial court exceeded its power by reevaluating the credibility of one of the witnesses, noting that when considering a Rule 59(e) motion, the court was permitted to " 'reconsider issues previously before it, and generally may examine the correctness of the judgment.' " Id. ¶ 36 (quoting Robinson/Keir P'ship, 154 Vt. at 54, 573 A.2d at 1190).

¶ 15. Unlike Drumheller, the family court's decision in this case was not based upon a reevaluation of the evidence previously presented at the termination hearing. Instead, the family court made supplemental findings based on new evidence that had not been presented at trial. Some of the evidence involved events that had taken place since the termination hearing, namely, the children's recent expressions of their desire to be part of their foster parents' family, and the

"rumor" that the children may not be able to remain in the current foster home. It was inappropriate for the court to decide DCF's Rule 59(e) motion based on this new evidence.[3]

¶ 16. DCF argues that the court did not base its decision on any new findings of fact, but merely reconsidered the law. We disagree. The court made clear that it learned two new facts at the hearing upon which it relied in reweighing the best-interest factors. The first was that the long-term stability of the foster placement was in jeopardy if the foster parents could not adopt the children, and the second was that the children had begun to express a desire to be a family with the foster parents. The original decision did not include these findings, which were based upon statements made by the attorneys and the foster mother at the hearing. The court based its decision to terminate father's parental rights at least in part on these new facts.

¶ 17. For this reason, we cannot hold the error to be harmless. See In re B.S., 163 Vt. 445, 454, 659 A.2d 1137, 1143 (1995) (applying harmless-error doctrine in termination proceeding and explaining that erroneous admission of evidence is grounds for reversal "only if the findings of the court, apart from the findings based on the improper evidence, did not support the court's conclusions"). Because the lower court's decision to grant DCF's motion and terminate father's rights was explicitly based on this new evidence, this Court cannot affirm the decision in the absence of such evidence without reweighing the evidence presented at the termination hearing— evidence which the trial court previously found to be insufficient to support termination of father's parental rights. As we have often repeated, it is the role of the trial court to weigh the evidence in the first instance. In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325, 97 A.3d 882 ("We leave it to the

---

[3] We note that 33 V.S.A. § 5113 allows the court to consider new evidence in the context of a modification proceeding. The statute provides that the court may, upon motion of a party or its own motion, "amend, modify, set aside, or vacate an order on the grounds that a change in circumstances requires such action to serve the best interests of the child." 33 V.S.A. § 5113(b). Any such order may only be made after notice and a hearing, at which any "helpful" evidence may be presented. Id. § 5113(c). Here, no modification request was made by the parties, and the court did not indicate that it intended to conduct a modification proceeding. Further, the requisite change in circumstances was neither alleged by the parties nor found by the court.

sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." (quotation omitted)).  Affirming the termination decision would require this Court to interfere with this essential function of the trial court, which we decline to do.

¶ 18.    We therefore remand the case for the family court to reconsider DCF's Rule 59(e) motion based on the evidence presented at the termination hearing.  The court must not consider any subsequently presented evidence in ruling on the motion.  No further hearing is required.

Reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____
Associate Justice